## THE MAYOR AND CITY COUNCIL OF BALTIMORE vs. JAMES P. GORTER, CITY COLLECTOR, AND JAMES H. SMITH, COMPTROLLER. THOMAS G. HAYES, A TAXPAYER, vs. THE SAME.

*Municipal Corporations—Powers of Board of Estimates Under Charter of Baltimore City—Right of City Council to Change Appropriations Proposed in Ordinance of Estimates—Veto of Part of Ordinance by the Mayor—City Council not Authorized to Fix Tax Rate Before Report of Board of Estimates—Construction of Charter as to Expenditures and Taxation.*

The new charter of Baltimore City, Act of 1898, ch. 123, passed in pursuance of the control over said municipality reserved to the Legislature by Constitution, Art. 11, created a Board of Estimates, composed of the Mayor, Comptroller and other officials, and directed that this Board should annually make out three lists of moneys to be appropriated by the City Council for the ensuing fiscal year. One of these is to contain "all amounts to be appropriated by the City Council for new improvements to be constructed by any department of the City during the next" year; and to enable the Board to make up this list, all heads of departments and other officers are required to file with the Board "their recommendations as to the amounts which they may consider will be needed in their respective departments for new improvemements during the next fiscal year." The other estimates relate to the expense of government and appropriations for charitable and reformatory institutions. It is declared that these lists, based upon information furnished to the Board by the various departments, shall embrace all moneys to be expended during the next fiscal year. The Board is directed to prepare and send to each branch of the City Council an ordinance providing appropriations sufficient to meet their estimates. The City Council is authorized to reduce the amounts fixed by the Board (with certain exceptions), but is prohibited from increasing the same, or inserting new items, or from subsequently appropriating money to be used during the

fiscal year for any of the purposes embraced in the Ordinance of Estimates. When passed by the City Council and approved by the Mayor, the·Ordinance of Estimates operates to appropriate the sums therein mentioned. In the draft of the Ordinance of Estimates for the fiscal year 1901, which was sent to both branches of the City Council, November 30th, 1900, that part relating to new improvements appropriated $190,000 for "purchase of lots, with the approval of the Mayor, City Comptroller and President of the School Board, erecting buildings, enlargement of existing buildings for school purposes."

The draft Ordinance also appropriated different sums, amounting altogether to $180,000 for new pavements on certain named streets, the kind of pavement to be laid being also designated, as well as the amount to be expended on each street. In the Second Branch of the City Council this draft ordinance was amended and the amendment was concurred in by the First Branch, in the following manner : In lieu of the item above set forth relating to schools, the following : " Amount to be appropriated by the City Council for new improvements, to be constructed by the Inspector of Buildings for the Board of School Commissioners during the fiscal year 1901—$190,000." In lieu of the several items for new pavements, the following : "Amount to be appropriated by the City Council for new improvements to be constructed by the City Engineer during the year 1901—$180,000." The ordinance so amended was passed and sent to the Mayor for his approval under sec. 23 of the Charter. This provides that if the Mayor does not approve an ordinance he shall return the same, within a certain time, together with his objections, to the Branch of the Council in which the ordinance originated, which shall, within five days, vote on the same, and if passed by a three-fourths vote over the veto shall be sent to the other Branch which shall, within the same limitation of time, vote on the same, and if also there passed by a three-fourths vote, the ordinance shall be effective notwithstanding the veto. It is also provided that if an ordinance shall embrace different items of appropriation, the Mayor may approve some of the items and disapprove or veto others. Upon receiving the Ordinance of Estimates, amended as above set forth, the Mayor, within the time limited, approved the same except as to the amendments made by the City Council ; these he vetoed and sent the veto message to the First Branch of the Council. That Branch took no action thereon, but returned the ordinance and message to the Mayor claiming that the ordinance originated in the Second Branch. Upon a case stated in equity. *Held,*

1st. That according to the true intent of the Charter, the Board of Estimates had the power to fix the items of expenditures for new improvements and to state the purposes for which the sum appropriated for schools should be used, in the manner pursued in the ordinance submitted to the Council, and that the Council was not authorized, by amending the ordinance, to strike out the items and substitute in gross the sum of the items to be applied to new improvements· in the discretion of the City Council by subsequent ordinances, the intent of the

Charter being that the judgment of the Board of Estimates should be controlling as to the purposes for which expenditures should be made.

2nd. That the City Council had no power to amend the draft of the proposed ordinance by changing as it did the item relating to public schools; the only power of the Council in the premises being either to adopt the ordinance or to reduce the amount of the appropriation; and it was not authorized to reserve for its future determination the application of the money appropriated to specific purposes.

3rd. That the Mayor's veto of the amendments of the ordinance was valid and effective, and it was not necessary to send the veto message to the Second Branch, the ordinance not having originated in that Branch, but having originated in the Board of Estimates.

4th. That consequently the two items of the amended ordinance relating to pavements and public schools are not valid parts of the ordinance, but the same are stricken therefrom by the Mayor's veto.

The said Board of Estimates is also directed by sec. 40 of said charter to send to both Branches of the City Council a report showing the taxable basis for the ensuing fiscal year and the amount to be realized from taxation and other sources, and the report shall state a rate for the levy of taxes sufficient to realize the amount required. It is then provided that in the ordinance making the annual levy of taxes, which shall be passed in the month of November in each year and as soon as practicable after the passage of the Ordinance of Estimates, the Mayor and City Council shall fix a rate of taxation not less than the rate stated in the aforesaid report, so that it shall not be necessary at any time for the city to create a floating debt to meet any deficiency. After the Mayor's veto of the amendments introduced with the Ordinance of Estimates as above set forth, the Board of Estimates, sent to the City Council a report, as directed by the Charter, fixing the tax rate for the year 1901 at $1.81½ on the $100. But before that time, the City Council had passed ordinances fixing the tax rate at $1.95. These ordinances were vetoed by the Mayor, but were subsequently passed by the City Council over the veto by the required vote. *Held,*

1st. That the provision in sec. 40, as to the time when the Board of Estimates shall send to the City Council the report on the tax rate is only directory; and it should be sent in after the passage of the Ordinance of Estimates.

2nd. That there was no power in the City Council to adopt a tax rate before receiving the report of the Board of Estimates, and that consequently the ordinance fixing the tax rate, passed as above set forth, is not valid, but the rate proposed in the report, not having been fixed by an ordinance, is not in force.

3rd. That the ordinance so passed over the Mayor's veto relating to the rate of taxation on suburban property is not affected by these considerations and is valid.

Appeals from a *pro forma* decree of Circuit Court No. 2, of Baltimore City, upon a special case stated in conformity with the 47th General Equity Rule. The case stated submitted the following questions to the Court:

1. Had the Board of Estimates the power to fix the items of expenditure for new pavements amounting to $180,100 and to state the purpose for which the $190,000 to be appropriated for schools should be used, in the form and manner in which it was done by them in the draft of proposed ordinance submitted by them to the City Council?

2. Had the City Council the right to amend the said draft of proposed ordinance, by changing the item as to street pavements and public schools as hereinbefore set forth?

3. Was the Mayor's veto of date of December 10th, 1900, a legal and effective veto?

4. Did the City Council have the power to adopt a tax rate when no rate had been sent to it by the Board of Estimates?

5. Had the City Conncil the right to consider and adopt the tax rate before the receipt of the report of the Board of Estimates and its statement of the tax rate, as was done by said Council on December 19th, 1900?

6. Are the ordinances, one entitled, "An ordinance to lay and collect a tax for the year 1901," and the other, "An ordinance to lay and collect a direct tax on suburban property as provided for in the laws of Maryland, Chapter 98, section 19, 1888, of Baltimore City for 1901," valid and legal ordinances and binding on James P. Gorter as City Collector of Baltimore City?

7. Are the two items in the Ordinance of Estimates for 1901 relating to the public schools and pavements above set forth, as amended by the City Council in the manner above set forth, valid and binding parts of said ordinance, or are the said items stricken from said ordinance by the veto of the Mayor communicated to the First Branch of the City Council as above set forth?

8. Is not said levy ordinance void *pro tanto*, as to the 13½ cents necessary to produce the $370,100, the exact amount of

the items of appropriations in dispute, and valid as to the balance, thus leaving a valid direct tax of 49 11-16 cents instead 63 3-16, and a valid total rate of $1.81½ instead of $1.95?

The cause was argued before McSherry, C. J., Briscoe, Page, Pearce, Schmucker and Jones, JJ.

*Wm. Pinkney Whyte, Edgar H. Gans* and *Olin Bryan*, for the appellants.

*Bernard Carter, Richard M. Venable* and *H. Arthur Stump*, for the appellees.

Jones, J., delivered the opinion of the Court.

This case brings before this Court for construction certain features of the present Charter of the City of Baltimore. This Charter is the scheme of municipal government provided for the City by the Act of Assembly of 1898, chapter 123. Prior to this Act, Article 4 of the Code of Public Local Laws, title, "City of Baltimore," contained the body of laws which prescribed and regulated the powers possessed by the City for the purposes of its government as a public municipal corporation. The Constitution of the State, Article 11, recognizes the City as a municipality, and, for its purposes as such, provides for the constitution of a Mayor and Common Council as governing agencies. In section 7 of this Article the City is prohibited from creating any debt except under the conditions therein prescribed. "All laws and ordinances," then in force applicable to the City, and "not inconsistent with this Article," are continued in force "until changed in due course of law." The Article then concludes with a section which is as follows: "The General Assembly may make such changes in this Article, except in section seventh thereof, as it may deem best; and this Article shall not be so construed, or taken, as to make the political corporation of Baltimore independent of, or free from the control which, the General Assembly of Maryland has over all such corporations in this State." As respects constitutional restriction, therefore, our Legislature is

left free, with the single exception named, as to its control over the public Corporation whose powers are here the subject of judicial scrutiny—as much so as it is with respect to all corporations existing for like purposes in the State.

The full and ample powers possessed by the Legislature over public corporations created and existing as agencies of government have repeatedly been declared by judicial decision. The effect of these, it is believed, is well stated by CHIEF JUSTICE LEGRAND, in the course of his opinion in the case of *Mayor & C. C. of Balto.* v. *State ex rel. of Board of Police*, 15 Md. at page 491, where he says : "Under the Constitution of Maryland the City of Baltimore is recognized as a public corporation, established for public purposes, and in this character it is in no wise distinguished from that of the several counties ; and except in so far as may be forbidden by the Constitution, like them it is liable to the control of the Legislature. Were this not so, civil government would be an impossibility, because of conflicting claims to the supreme power urged by the different geographical departments into which the State is separated. The power   \*   \*   \*   *which creates, can revise, modify, annihilate ;* it can change, *not only the limit*, but *the nature of the power*, and also the *depository* of it.*"

We are not confronted in this case with any constitutional question. We understand the power of the Legislature as affecting any question we are to decide is not called in question ; and what has been said merely evolves the initial proposition lying at the base of the inquiry we are called upon to make. This is that in pursuing this inquiry the will of the Legislature, as it may be found expressed or as indicated by fair and proper inference, is to be the dominating factor in determining the meaning and effect of its work or any part of it, in conferring the chartered powers that the Court is called upon to construe. In construing these powers and determining their extent and effect, reference must be had not only to the grant of power, but to the restrictions and limitations that may be found imposed upon its exercise ; for the restrictions and limitations imposed are as much the expression of the legislative

will as is the grant of power. The power actually possessed, however general the terms in which it may be granted, standing alone, may be, is that which will appear when read in the light of, and subjected to, the limitations intended to abridge and control it. These general observations express the rule by which the powers of the corporation are to be construed when it is considered in its aggregate capacity. The rule applies with the same force in the construction of power conferred upon any one of its constituent parts or upon any of the agencies provided for the execution of its purposes.

The Charter in question, provided by the Act of 1898, creates " The inhabitants of the City of Baltimore," a corporation, " by the name of the 'Mayor and City Council of Baltimore.' " In section 6 of the Charter, " The Mayor and City Council of Baltimore" are clothed with numerous powers—among them the power "to levy annually upon the assessable property of the City, by direct tax, with full power to provide by ordinance for collection of the same, such sum of money as may be necessary, in its judgment, for the purpose of defraying the expenses of said city over and exclusive of all expenses, charges and sums of money which it is, or shall be, required by law to collect for other purposes subject to the provisions and limitations herein contained." This power is conferred upon the corporation as a whole, and not upon any one constituent part or any department thereof; and it is to be exercised by the corporation acting through all the corporate agencies that under the law of its being are concerned with duties in regard to it. It was in the attempted exercise of this power that the conditions transpired out of which arise the questions now presented for determination here. These conditions are due to the conflicting claims as to their respective powers and duties in respect to levying the necessary taxes for the purposes indicated in the quotation from section 6 of the Charter, between the Department of the City government denominated in the Charter as the City Council and the body denominated therein as " The Board of Estimates." This brings us to an inquiry into these respective powers and duties. The Charter

provides that the Legislative Department of the City government "shall be vested in the City Council which shall consist of two branches, one of which shall be the First Branch, and the other the Second Branch." It then provides for the election of the respective branches by the people and for their organization into legislative bodies, (secs. 209 to 222 inclusive of the Charter.) Section 218 provides that "The Mayor and City Council of Baltimore shall have power to pass all ordinances necessary to give effect and operation to all powers vested in the Corporation of the City of Baltimore." It may be conceded that the City Council, being the Department of the City government nearest to the source of power, was intended to be the chief depository of power ; yet, as has been seen, this power must be taken as subject to the limitations and restrictions imposed by the law which brings the corporation of which it is but an agency, into being. Its chief function is municipal legislation in the way of passing ordinances for the various purposes of municipal government. It appears, however, from section 218 just quoted, that the power to pass ordinances is not the function of the City Council as a separate and distinct department of the City government, but it is the corporation " The Mayor and City Council of Baltimore" that "shall have power to pass all ordinances," &c. These ordinances, therefore, are to reflect the power of all the corporate agencies that may be found to be charged with a duty in regard to their origination, their subject-matter, or the character and form that are to be given to them when being formulated into law. As laws, they must express the will of the entire corporation. A Mayor to be elected by the people is, under the Charter in question, the chief executive officer of the Corporation and the executive power of the municipality is vested in the "Mayor, the departments, sub-departments, municipal officers not embraced in a department * * and such special commissioners or boards" as may be provided for by laws and ordinances not inconsistent with the Charter.

Among the departments created in this distribution of executive power is the "Department of Finances," one of the

sub-departments of which is a "Board of Estimates," com-
posed of the Mayor, City Solicitor, Comptroller, President of
the Second Branch City Council and President of the Board
of Public Improvements, which officers fill the positions of
highest dignity and responsibility known to the City govern-
ment. The powers and duties of the Board of Estimates are
in the main defined in sections 36 to 40, inclusive, of the Char-
ter. It is empowered to summon before it at any time, the
heads of departments and sub-departments, and all municipal
officers and special commissions or boards, and is required an-
nually between the first days of October and November, to
meet and by affirmative vote of a majority of all the members,
make out three lists of moneys to be appropriated by the City
Council for the next ensuing fiscal year. The first list to in-
clude the amounts estimated to be required to pay the expenses
of conducting the public business for the next ensuing fiscal
year, prepared in such detail as to the aggregate sum and the
items thereof as the Board shall deem advisable. The esti-
mates to "specify, in detail, the objects thereof, and the items
required for the expenses of the City Council, and the respec-
tive departments, sub-departments, municipal offices not em-
braced in a department, and special commissions or boards
*   *   *   including a statement of each of the salaries of the
members of the City Council and its officers and clerks, and
the salaries of the deputies, assistants, clerks, employees and
subordinates in each department, sub-department, municipal
office or special commission or board." And to enable the
Board to make this list, the Presidents of the two Branches of
the City Council, the heads of departments, and sub-depart-
ments, municipal officers and special commissions and boards
are required to send to the Board of Estimates in writing, at
least thirty days before the list is required to be made, esti-
mates of the amounts needed for the conduct of their respec-
tive departments or offices for the next ensuing fiscal year veri-
fied by oath or affirmation.

The second list is to contain "all amounts to be appropri-
ated by the City Council for new improvements to be con-

structed by any department of the City during the next ensu-
ing fiscal year" and to be known "as the estimates for new
improvements ;" and to enable this list to be made up, heads
of departments and sub-departments, municipal officers, spe-
cial commissions and boards are required to file in writing with
the Board of Estimates, thirty days before the time such list
is required to be made, "their recommendations as to the
amounts which they may consider will be needed in their re-
spective departments for new improvements during the next
fiscal year."    The third list is to contain "all amounts which
by previous laws, ordinances or contracts are required to be
annually appropriated to charities, educational, benevolent or
reformatory institutions by the City, as well as all other sums,
if any, which may be required by laws or ordinances to be
appropriated for other purposes, not embraced in the preced-
ing lists."    It is declared to be "the purpose and object" of
the provision requiring these lists to be so made up that they
"shall embrace all moneys to be expended for the next ensu-
ing fiscal year for all purposes, by the City."

After these lists are prepared the Board of Estimates is re-
quired to "cause to be prepared a draft of an ordinance to be
submitted to the City Council, providing appropriations suffi-
cient to meet the amounts called for by said three lists ;" and
after making publication of the same for two days to send "a
copy of the draft of said proposed ordinance to the President
of each Branch of the City Council."    The Mayor is then
required to call a special meeting of the City Council forth-
with to consider the "proposed ordinance ;" and it is made
"the duty of the two Branches of the City Council, when so
assembled, to consider and investigate the estimates contained
in said proposed ordinance, and to hold daily sessions for its
consideration until said ordinance is passed."    The two Branches
of the City Council, by a majority vote of all the members
elected to each Branch are authorized to reduce the amounts
fixed by the Board of Estimates in the proposed ordinance,
except such items as are fixed by law, such as are inserted to
pay State taxes and such as are intended to pay the interest

and principal of the municipal debt; but, it is provided they shall not have the power to increase the amounts fixed by the "Board of Estimates," "nor to insert any new items in the proposed ordinances." When this proposed ordinance has been passed "by both Branches of the City Council and approved by the Mayor," it is to be known as the "Ordinance of Estimates" for the year for which the appropriations provided for therein are intended; and the sums therein appropriated "after the beginning of the next ensuing fiscal year," are to "become appropriated" and available "for the several purposes therein named, to be used by the City Council, departments, sub-departments, municipal officers not embraced in a department, and special commissions or boards therein named and for no other purpose or uses whatever."

The City Council is expressly denied the power "to enlarge any item contained" in this ordinance, after it is passed, "by any other or subsequent ordinance or resolution." It is also provided that the City Council shall not "by any subsequent ordinance or otherwise, appropriate any sums of money to be used for the next ensuing fiscal year, for any of the purposes embraced in "the Ordinance of Estimates; and that no appropriation provided for in this ordinance" shall be diverted or used under any circumstances for any other purpose than that named in the Ordinance of Estimates; and that "no temporary loans shall be authorized or made, to pay any deficiency arising from a failure to realize sufficient income from revenue and taxation to meet the amounts provided for in said ordinance." In case there is a deficiency, it is provided there shall be a *pro rata* abatement of all appropriations with certain exceptions; and in case there is a surplus of revenue over expenditures, such surplus is to "be passed to the.Commissioners of Finance to be credited to the general sinking fund," (sec. 36).

The Board of Estimates is given entire control over the grant by the Mayor and City Council of any "franchise or right to use any street, avenue, alley, or highway  *  *  or right for the use of any public property" belonging to the

City.    The proposed grant of any such right is to be in the
form of an ordinance which, after having been introduced into
the City Council, is to be referred to the Board of Estimates
which is to "make diligent inquiry as to the money value of
the franchises or right proposed to be granted and the ade-
quacy of the proposed compensation to be paid therefor to
the City;" and the Board is charged with the duty to fix in
the ordinance the compensation to be paid for the grant at the
largest amount that can be obtained, &c.; and the grant shall
not be made by the City Council except for the compensation
and on the terms approved by the Board of Estimates in the man-
ner prescribed in the charter.    The like provision is made to
apply to any renewal or extension of any right relating to the
use of the public property (sec. 37).    The Board of Estimates
is required to include annually in the "Ordinance of Estimates,"
"the sum of fifty thousand dollars to be used as a contingent
fund" by the Board under regulations prescribed; and "the
City Council shall not have the power to increase or decrease,
or strike out said amount from the said Ordinance of Esti-
mates" (sec. 38).    The Mayor and City Council are prohib-
ited from appropriating any money "for the payment of any
private claim against the City, unless such claim shall have
first been presented to the Board of Estimates, together with
the proofs upon which the same is founded, and reported fav-
orably by said Board" (sec. 39).

The Board of Estimates are further charged with the duty
to procure, on the first day of October in each year or as soon
thereafter as practicable, from the proper municipal depart-
ment, and to "send with the Ordinance of Estimates, to both
Branches of the City Council a report showing the taxable basis
for the next ensuing fiscal year, and the amount which can
reasonably be expected to be realized by taxation for said year."
This report is to be made up to show the difference between
the income that can reasonably be expected to be received
by the City for the next ensuing fiscal year from licenses, fees,
rents, and all other charges, including the amount believed to
be collectible from taxes in arrear, and the anticipated expen-

ditures during such year ; and "shall state a rate for the levy of taxes sufficient to realize the amount required to meet the said differences." It is then provided that "in the ordinance making the annual levy of taxes, which ordinance shall be passed by the Mayor and City Council of Baltimore, in the month of November in each year, and as soon as practicable after the passage of the Ordinance of Estimates, the Mayor and City Council of Baltimore shall fix a rate of taxation not less than the rate stated in the aforesaid report ; so that it shall not be necessary at any time for the City, its officers or agents, to create a floating debt to meet any deficiency, and it shall not be lawful for the City, its officers or agents, to create a floating debt for any purpose" (sec. 40). Again in section 85 of the Charter (which is. here referred to only in the way of illustration) it is provided that when any ordinance for a public improvement, not included in the Ordinance of Estimates, exceeding in cost the sum of two thousand dollars, has passed its first reading in the Branch of the City Council in which it originates, it is to be first referred to the Board of Public Improvements as to its advisability and the needs of the City for such an improvement, and then referred by that board with its opinion in writing attached to the ordinance, "to the Board of Estimates for its opinion in writing as to the probable cost, and whether the financial condition of the City will justify such an expenditure ;" and further action is forbidden to be taken by the City Council in regard to said ordinance until these reports shall have been made to both Branches of the City Council and entered on their respective journals.

From this general review of the powers and duties, under the charter here in question, of the City Council and the Board of Estimates, the two agencies of City government with which we are here concerned, it is quite obvious that it was the intention of the charter that the Board of Estimates should have a very important and controlling influence in operating the financial department of the City government. The amount of official influence and responsibility brought together in its make up ; the nature of the duties assigned to it ; the clear and

emphatic negation of power to the legislative department that might be inconsistent with, or might embarrass the exercise of functions assigned to it, are considerations that go to make this manifest. The evident object of the Board of Estimates as a feature of the Charter was to provide a more orderly administration of the finances of the City, to secure more deliberate and careful judgment as to expenditure of the public money, and greater watchfulness over, and economy in making this expenditure; thereby avoiding, as far as practicable, unnecessary taxation and the accumulation of debt by reason of unsytematic methods. This being so, the powers of such an ageney in a system of municipal government are not to receive at the hands of the Courts a narrow or illiberal construction; but rather one that will tend to advance the purpose of its creation. It is not meant by this that the Courts are to determine any question of construction according to their notions of the wisdom or expediency of the means adopted to secure the purpose, or of the policy that dictated their adoption. These are considerations that are properly addressed only to the law-making department of the government. Where, however, this department has indicated a purpose to be accomplished and in its wisdom has provided the means of its accomplishment, a proper respect for its judgment and a proper recognition of its independent function of government, require the Courts in passing upon its act in this regard to have in view the effectuating of the main purpose. In this view the considerations mentioned must have influence in determining the meaning and effect of every part of the legislative act because the Legislature must have intended the means to be in harmony with the purpose. In the case in hand, that the Legislature intended the Board of Estimates as a principal means of accomplishing the wise and proper objects already indicated seems quite obvious. Therefore it is that its powers are not to be narrowed and restricted by construction.

We come now to the questions of more immediate concern in the case before the Court. It appears from the record that the Board of Estimates provided for in the Charter of the City

of Baltimore, here under consideration, in pursuance of the duty prescribed to it in the Charter, prepared the draft of an Ordinance of Estimates for the fiscal year 1901, and on the 30th of November, 1900, this draft was submitted simultaneously to both Branches of the City Council. No action was taken in the Second Branch until the next day, December 1st, 1900, when on motion the ordinance was referred to a joint special committee composed of three members from each Branch. On December 4th, 1900, the ordinance was passed by the Second Branch. When the ordinance was received in the First Branch, upon motion, the consideration of it was postponed to the next meeting; and on December 1st, on motion, the members of the Second Branch were invited to confer with members of the First Branch in regard to the Ordinance of Estimates. This invitation was accepted and then, on motion, in the First Branch a committee was appointed to confer with a similar committee of the Second Branch, said joint committee to take charge of and consider the ordinance and report to their respective Branches. On December the 5th the First Branch amended the ordinance, which had been, the day before, passed by the Second Branch and passed it as amended. On the 6th of December, the ordinance thus amended was received by the Second Branch, where a substitute was offered and adopted for the amendment made in the First Branch. On the same day this substitute was adopted by the First Branch and the ordinance as amended by this substitute was finally passed by both Branches of the Council.

When the ordinance was sent to the City Council by the Board of Estimates it provided for new improvements as follows:

"Purchase of lots, with the approval of the Mayor, City Comptroller and President of the School Board, erecting buildings enlargement of existing buildings for school purposes.$190,000 00

" New pavements."

" Carey street, from Lexington to Columbia avenue, Belgian blocks . . . . . . . 44,000 00"

"' Chase street from Broadway to Wolfe street,
sheet asphalt . . . . . . . . . .    11,300 00"

"' Thames street, from Philpot to Wolfe street,
Belgian blocks . . . . . . . . . .    13,200 00."

"' Madison street, from Buren street to Green-
mount avenue, Belgian blocks . . . . .    11,300 00"

"' Baltimore street, from Chesapeake to Grove
street, sheet asphalt . . . . . .. . . .    4,500 00"

"' Block street, from Drawbridge to Thames
street, Belgian blocks . . . . . . . .    7,900 00"

"' North avenue, from Eutaw Place to St. Paul
street, sheet asphalt . . . . . . . .    60,000 00"

" McCulloh street, from Lanvale street to La-
fayette avenue, asphalt blocks . . . . .    5,400 00"

"' Barnet street, from Charles street to Liberty
street, asphalt blocks . . . . . . . .    2,500 00"

" Fort avenue, from B. & O. crossing to Hull
street, Belgian blocks . . . .. . . . .    20,000 00"

The amendment that was made to it by the City Council
was the striking out of all the items that have been here set
out and the substitution therefor in the ordinance of the follow-
ing :

In lieu of the first item appropriating $190,000
for " erecting buildings, &c., for school pur-
poses, " Amount to be appropriated by the
City Council for new improvements, to be
constructed by the Inspector of Buildings for
the Board of School Commissioners during
the fiscal year 1901 . . . . . . . . $190,000 00"

In lieu of the several items for new pavements :
" Amount to be appropriated by the City
Council for new improvements, to be con-
structed by the City Engineer during the
year 1901 . . . . . . . . . . . $180,000 00"

After the ordinance had been passed as amended it was sent
to the Mayor for his approval in accordance with the provi-
sions of section 23 of the Charter. This section requires all

ordinances after being duly passed by the City Council to be sent to the Mayor for his approval, and if he shall not approve an ordinance, he is required to " return the same with his objections in writing to the Branch in which the said Ordinance originated, within five days of actual regular sittings of said Branch," &c.   When these objections are received by the Branch of the Council to which they are thus sent the same are to be forthwith read and entered at large on the journal of the Branch and the said Branch is required after five and within ten days after the return of the ordinance and the objections, to " proceed to reconsider and vote upon the same," and if passed over the veto by the said Branch by a vote of three-fourths of all the members elected to said Branch it shall be sent with the Mayor's objections to the other Branch, and within the same limitations as to time, it is to be reconsidered and voted upon by the said other Branch, and if therein passed by a vote of three-fourths of all the members elected to said Branch it becomes an effective ordinance notwithstanding the veto.   It is also provided that " if any ordinance or resolution duly passed by the City Council shall not be returned by the Mayor to the Branch of the City Council in which the same originated within five days of its actual regular sittings, excluding special sittings called by the Mayor, after it shall have been delivered to him, the same shall become an ordinance or resolution of the Mayor and City Council of Baltimore in the same manner as if the Mayor had approved it, unless the City Council by an adjournment *sine die*, or for a period exceeding one month, shall prevent its return."   It is further provided that in case an ordinance shall embrace different items of appropriation the Mayor may approve the provisions of the ordinance relating to one or more of the items and disapprove others.   Those that he approves " shall become effective," and " those which he shall not approve shall be reconsidered," in the same " manner and form," as provided in case of the veto of an entire ordinance ; and the same mode and manner of procedure of both Branches of the City Council are to be observed as prescribed in case of the veto of an entire ordinance.

The Mayor upon receiving the Ordinance of Estimates, within the time prescribed in section 23, returned the same to the First Branch of the City Council with his approval of all the items contained in the ordinance except the items which had been incorporated therein by the City Council by way of amendment, and which have been recited. These last-named items he vetoed, accompanying his veto with a message to the First Branch of the Council, giving reasons therefor. The First Branch returned the ordinance and the veto message to the Mayor, claiming that the same should have been sent to the Second Branch of the Council, because the ordinance was to be considered as having originated in the last named Branch. Whereupon the Mayor again sent the ordinance and message to the First Branch with a second message controverting the claim that the said Branch was not the proper one to receive and act upon them. The First Branch after thus receiving the ordinance and message, took no action in regard to the same as prescribed in section 23, of the Charter.

The facts which have been so far stated in connection with the provisions of the Charter that have been set out, give rise to certain of the questions propounded in the record for the Court's decision. The first of these is : "Had the Board of Estimates the power to fix the items of expenditure for the new improvements amounting to $180,100 and to state the purpose for which the $190,000 to be appropriated for schools should be used, in the form and manner in which it was done by them in the draft of proposed ordinance submitted by them to the City Council." This question must receive an affirmative answer. As against this right or power of the Board of Estimates, it is insisted that the Board of Estimates is not authorized to do more, under the head of Estimates for new improvements, than to fix the sum or amount as a whole that is to be appropriated to any one department that has supervision or control over works of new improvements, and that it is to be left to the City Council to distribute and apply such sum or amount to specific uses ; or if the Board of Estimates itemizes such sum or amount and indicates the

specific uses to which it is to be applied in the Ordinance of Estimates which the Board is required to submit to the Council, it is in the power of the City Council, by amending the ordinance, to strike out the items, and substitute in gross the sum of the items to be applied to new improvements in the discretion and judgment of the City Council by subsequent ordinances. By reference to Article 4, Code of Public Local Laws, title City of Baltimore, as the same stood prior to the adoption of the Charter we are here dealing with, it will be found that if the view of the powers of the City Council, which has been stated as claimed for it, is to prevail, the City government, as to its department of finance, will be very largely remitted to the methods which obtained under the system which was superseded by the present Charter.

The Legislature by making, as it has done, an entire substitution for the body of laws which at the time of the adoption of the present Charter regulated the powers of the municipal government and of its constituent parts and agencies, indicated a purpose to make a complete change of system ; and in no one department of the present City government is change of methods more carefully prescribed or the purpose of change of system more emphasized than in the department of finance. The general presumption therefore does not favor the contention of the City Council. As we have seen, the City Council has no inherent function that the Legislature cannot control. It has the powers conferred upon it by the Legislature to be exerted to the extent that the Legislature has not seen fit to restrict them. It would seem that it could not have been the intent of the Charter to confine the Board of Estimates to the comparatively perfunctory duty of indicating general amounts for appropriation and application by the City Council without reference to the judgment of the Board of Estimates as to the purposes for which expenditures were to be made. In the discharge of its duty this Board is authorized and required, as has been seen, to make up its list of amounts to be appropriated for new improvements from information furnished the Board by heads of departments, &c., "as to the

amounts which they may consider will be needed in their re-
spective departments for new improvements during the next
fiscal year." Now if the Board of Estimates must blindly
accept the amounts recommended by these departments as
fixing the appropriations to be made, and simply transmit them
to the City Council for its absolute control of them within the
amounts, and only subject to the general purpose of the ap-
propriation recommended, why did the law provide that the
departments should send their recommendations to the Board
of Estimates ? Why not have them sent direct to the City
Council ? Why this complication of the system with machin-
ery and routine that effected nothing ? When we take into con-
sideration the composition of the Board of Estimates, the
powers conferred upon it, and the careful provisions of the
Charter for having appropriations made upon information sent
to this Board and by it prepared for submission to the City
Council, it seems obvious that this information and the recom-
mendations of the departments were to be subjected to the
scrutiny and judgment of the Board of Estimates as to the
necessity and propriety of the appropriations recommended to
be made. The exercise of such scrutiny and judgment, in-
telligently and effectively, requires imperatively a knowledge
of the items of the proposed expenditure for which an appro-
priation may be recommended, together with as fair and close
an estimate of, and approximation to, the cost of any particu-
lar improvement, as it may be practicable to obtain. The
judgment of the Board in reference to the necessity and pro-
priety of an expenditure for improvements must have refer-
ence to the particular improvements specified in the items fur-
nished to it as a basis of the estimates to be made. A par-
ticular locality might present needs for improvements so urgent
as to justify an increase in the burden of taxation for the pur-
pose of making them ; while improvements asked for in other
localities might be unnecessary, or if they presented merits at
all, might be more judiciously postponed for a more favorable
condition of finances. This would require discrimination as
to the object of expenditure—an important element of judg-

ment in adjusting the relations between the revenues and expenditures of a municipality. The Board of Estimates therefore, in making up the aggregate of the appropriations to be provided for in the Ordinance of Estimates, which it is made their duty to prepare and send to the City Council, has to judge relatively between the public needs for which appropriations are asked to be made. This can only be done by a comparison of items through which the Board is made acquainted with the particular uses to which moneys appropriated are to be applied.

The considerations adverted to seem to point irresistibly to the conclusion that in estimating amounts to be inserted in the Ordinance of Estimates, as the appropriations for any fiscal year for new improvements, the Board of Estimates has the right, and it is its duty to have before it and pass judgment upon the items of any proposed expenditure, as the basis and groundwork of its final judgment fixing the appropriation to be made for such improvements. If this be so, the Board would be doing a vain and useless work if, after having made up its judgment as to the necessity or propriety of an appropriation for this purpose, based upon the needs appearing from the items furnished and the specific purposes to which the money appropriated was to be applied, its power was limited, when drafting the ordinance of estimates, to inserting therein simply the aggregate amount of the proposed appropriation leaving the application of the amount solely to the will of a different tribunal. In such case the law would set up one official judgment to be counteracted and set at nought by another acting without reference to the first. On the other hand the inserting of items, indicating the specific uses of an appropriation, would not only seem to be a proper exercise of power on the part of the Board of Estimates from the considerations that have been adverted to, but its exercise must tend to harmony and efficiency in the working of the system of municipal government in that it supplies to the City Council itself a more intelligent basis for its own action upon the ordinance of estimates. The Council can adopt the ordinance in its entirety,

or it can reduce the amounts proposed to be appropriated. Either the one action or the other can be taken more intelligently by the City Council with the information disclosed to it in the ordinance itself as to the purposes for which the money to be appropriated is intended to be used.

It is further insisted that the appropriations proposed by the ordinance of estimates under the head of new improvements contained matter of legislation. It is not perceived how this is material. It would not vitiate the act of the Board in providing the appropriations in question in the ordinance. It would only be proposed legislation. No act of the Board of Estimates in respect to appropriations is final; and it is not capable of any legislative act that would be binding upon anybody. The proposed legislation could only become final and effective by the act of the City Council adopting it. The matter of legislation being proposed by the Board of Estimates could not in any manner affect the right or power of the City Council to "reduce" the appropriations proposed by the Board. And if the matter proposed in the way of legislation should be adopted by the City Council, no power that this body possesses as to subsequent legislative action in reference to the appropriations made would be in any wise impaired.

The second question propounded in the record is: "Had the City Council the right to amend the said draft of proposed ordinance, by changing the item as to street pavements and public schools as hereinbefore set forth?" A negative answer to this question results from the conclusions reached in regard to the matter of the first question. If the proposition be established that the Ordinance of Estimates as drafted by the Board of Estimates and proposed to the City Council properly specified the purposes for which the appropriations were to be used, the only power the City Council had to deal with the proposed ordinance was to adopt it or reduce the amounts of the proposed appropriations. To reduce the amounts is the only power conferred upon the City Council to control the judgment of the Board of Estimates. They are expressly forbidden to increase amounts or to insert any new items. There

is no substantial difference between the right to insert new items and the right to change the substance and form of items by amendment so as to give them different force and effect. The amendments of the City Council changed the whole effect of the ordinance in respect to items embraced in the amendments. Instead of the moneys appropriated in the items being applied to the specific purposes therein indicated, they are reserved by the amendments to be thereafter appropriated to specific purposes in the judgment of the City Council.

The amendments also contravene the intent of the Charter that the Ordinance of Estimates when passed should fix the appropriations for the fiscal year and the purposes to which they are to be applied. As has been seen it is provided that the said several sums contained in the Ordinance of Estimates shall, when the ordinance has been passed, "be and become appropriated" for the fiscal year "for the several purposes therein named. * * * and for no other purposes and uses whatever." Plainly the Charter does not contemplate a change to be made in the Ordinance of Estimates by the City Council which would reserve to itself the right to appropriate the moneys, indicated by the Board of Estimates as proper appropriations, after the ordinance is passed. The moneys are appropriated by the ordinance and for the purposes indicated and fixed in the ordinance. Even though it should be that the specific purposes are not to be named in the ordinance, still moneys are not to be appropriated after the passage of the ordinance at the pleasure of the Council which would be the effect of the amendments in question ; for these leave it to the subsequent action of the City Council, whether the moneys in question will be appropriated or not. Each of the amendments reads, "amount *to be* appropriated by the City Council."

The third question in order is : "Was the Mayor's veto of date of December 10th, 1900, a legal and effective veto?" It is contended that this veto is not effective because it was not sent to the Branch of the City Council in which the vetoed ordinance originated in accordance with the provisions of section 23, which have been set out. And because of the fact that the

Second Branch was the first to pass the Ordinance of Esti-
mates it is further contended that this Branch is to be held to
be the one in which the ordinance originated.   The Ordinance
of Estimates does not originate in either Branch of the City
Council, nor with the City Council at all.  It has already been
seen what a small control the City Council has over it.   It
originates in the Board of Estimates.  It is not simply a com-
position by the Board of Estimates as has been suggested.  It
is a measure for legislative action created by the Board of Es-
timates by the express requirements of the law and by the
Board as an official body.   When it goes to the City Council
it goes with legal and official sanction ; and immediately be-
comes, by the express command of the law, a subject of con-
sideration and action by both Branches of the City Coun-
cil.   As has been seen the Charter provides that a copy of
the draft of the ordinance is to be sent to the President of
each Branch of the City Council "immediately" after the pub-
lication provided for.   A meeting of the City Council is to be
"forthwith called by the Mayor, to consider such proposed or-
dinance."   It is then made the duty of "the *two* Branches of
the City Council," not of one alone, when assembled, "to con-
sider and investigate the estimates contained" in the ordi-
nance, "and to hold daily sessions for its consideration until"
it "is passed."   The ordinance, therefore, when it reaches the
City Council becomes in contemplation of the law subject of
legislative consideration and action immediately, and so re-
mains, in each Branch of the Council until it is passed.
It is precisely the same measure in each Branch.   It is not in
the category of an ordinary legislative measure which may in
like verbiage and terms be introduced simultaneously in the
two members of a dual legislative body.   Such a measure is
an independent and different one in each body and acquires no
legislative *status* without some action by the body into which
it is introduced.   The two measures, when given a legislative
*status*, are distinct and different because of the difference of
origin.   Here the measure is the same one though pending
in the two bodies.   It had its origin as the creation of the law.

It was created for the purpose of being made the subject of legislative action and was made so by the law in each body to which it was sent immediately upon its creation.

It cannot be said because the ordinance in question did not originate in either Branch of the Council, as distinct and separate from the other, therefore it is not subject to the veto of the Mayor. It is expressly made subject to approval by the Mayor (sec. 36). As it must be submitted for the Mayor's action, it must have been intended as a matter of fair construction that it was to be like other ordinances, subject to the powers vested in him, as a constituent part of the corporation, over legislation. So far as it could be said to have originated with the City Council at all, it had origin simultaneously in both Branches of the City Council, and this was so by the express terms of the law, and therefore known to the Mayor.

It does no violence, in this view, to the terms of section 23, upon which the contention against the effectiveness of the veto rests, to hold that the veto in case of its being appplied to the Ordinance of Estimates may be sent to either Branch of the City Council. An important official power or function ought not to be defeated or embarrassed by too strict a construction in a matter of this sort. To which body in a dual legislative assembly a veto message is to be sent is not a matter of substance, or of principle, or policy. It is more a matter of orderly procedure. It could scarcely be a matter of great importance to which body it was sent to affect a matter of legislation by both in any case ; and the common provision that a veto of a matter of legislation by a dual body is to be sent to the body in which it originated was probably primarily suggested only by a certain propriety in so doing.

The question just discussed will be answered affirmatively. And this answer carries with it a negative answer to the part of question 7, whether the two items of the Ordinance of Estimates relating to public schools and pavements are valid and binding parts of said ordinance ; and an affirmative to that part of the same question, "are the said items stricken from said ordinances by the Mayor's veto thereof."

The remaining questions propounded in the record relate to the validity of the ordinances establishing the tax rate for the year 1901. These ordinances were passed by the City Council on the 19th of December, 1900, were vetoed by the Mayor and subsequently passed by the City Council over the Mayor's veto. On December 22nd, immediately after the expiration of ten days from the time of the receipt by the City Council of the Mayor's veto of the Ordinance of Estimates, the Board of Estimates sent to the City Council a report made up as directed in section 40 of the Charter, and fixing the tax rate therein for the year 1901 at $1.81½ on the $100. The ordinances passed by the City Council on the 19th of December fixed the tax rate for the City of Baltimore proper at $1.95 on the $100, and the rate for the annex at 60 cents on the $100; and were passed as appears from the dates given, before the report of the Board of Estimates fixing a rate of taxation had been sent to the City Council.

Before discussing the main question, we think, the view of counsel for the appellant that the provision in section 40 of the Charter as to the time when the report of the Board of Estimates fixing the tax rate is to be sent in must be held as directory is correct. " Generally, when no rights will be impaired, provisions, with no negative words or implications, concerning the time and manner, and more especially the time, in which official persons shall perform designated acts, are directory." *Bishop on the Written Law*, sec. 255. The substantial thing to be accomplished here was to get before the City Council the information in official form upon which they were to fix the tax rate for the ensuing fiscal year. A definite and fixed time is not provided for the report in question to be sent in. There is no express prohibition against sending it in after the time which is designated by reference to the Ordinance of Estimates ; nor is there any reasonable implication that it can be disregarded if sent in after such time. On the contrary it is reasonable to suppose that it was not intended that the object, to be accomplished by the furnishing officially of the information the report is required to give, was to fail because the re-

port was not sent in with strict reference to the time of send-
ing it.

We agree also to the view that a fair construction of the
law indicates that the report in question is to be sent in after
the passage of the Ordinance of Estimates.   Section 40, which
begins with the provision for sending in the report in question,.
deals entirely with the perfected Ordinance of Estimates.   And
when it is seen that, by provision contained in the same sec-
tion, the rate of taxation which the report is to fix is not to be
fixed by the City Council until after the passage of the Ordi-
nance of Estimates, in connection with the consideration that
it would not be practicable to fix a rate of taxation with cer-
tain reference to the amount to be raised for appropriations.
until after the Ordinance of Estimates had passed and fixed
the appropriations to be made, the force of the view just alluded
to will abundantly appear.

Now, was it competent for the City Council to adopt a tax
rate before it received the report of the Board of Estimates.
containing the information therein required to be given and
fixing a rate of taxation ?  If this could be done by the City
Council it would be equivalent to striking out of the Charter
the entire provision in reference to the making up and sending
the report in question by the Board of Estimates.   Would the
Court be justified in doing this ?  Courts ought to construe
laws so that all parts of the law should, if possible, be upheld
and given effect ; and they ought to hesitate to destroy the
effect of any clear provision of the law in the process of con-
struing it.   There is no middle course in dealing with the
provision here in question.   It must be given effect, or it must
be rendered nugatory.   If the City Council had the right to
proceed with the making of the tax levy without reference to
a report in official form and under official sanction from the
Board of Estimates as provided in section 40, then in effect
this provision is to be pronounced without force.   Can this be
done ?  It was evidently in the mind of the law-makers an im-
portant provision.   The greater part of section 40 of the Char-
ter which prescribes how the tax rate is to be fixed consists in

prescribing how the report in question is to be made up, what it shall contain in the way of statistical information as a basis for the tax levy and that it shall state a rate for the levy of taxes sufficient to realize the amount of taxes needed. The intention of the provision in question seems to be plain and is that there shall be an official channel through which the information and statistics necessary to fix a proper tax rate shall go to the City Council which is to make the final provision in the way of legislation for establishing a rate at which taxes are to be levied and collected.

That the Charter intended that the City Council should have this report before them when the tax levy is made is plain from the provision that the Council shall not. fix a rate for the levy of taxes less than the rate stated in the report of the Board of Estimates. This is a provision that, in a legal sense, it is impossible to gratify without having the report as a guide to the rate to be fixed. The reason for the provision is explained and stated in the law to be " that it shall not be necessary at any time for the City, its officers or agents, to create a floating debt to meet any deficiency ;" and it is then provided that " it shall not be lawful for the City, its officers or agents, to create a floating debt for any such purpose." Here, then, it is declared in the law itself that the provision in question is intended to serve a most important public end. In view of this it would be unreaaonable to hold that it need not be observed and can be disregarded. It would be much more in consonance with its evident spirit and declared purpose to hold it to be a limitation upon the power of the City Council, and that in the distribution of powers under the Charter and fixing those of the several agencies of the city government in reference to taxation, the City Council has not been clothed with the power to make levy for taxes, except in the mode prescribed in the provision of the Charter we have been here considering and under the limitations therein imposed.

From this it follows that there was no power in the City Council "to consider and adopt the tax rate before the receipt of the report of the Board of Estimates and its statement of the

tax rate, as was done by the Council on December 19th, 1900 ;" which is an answer to question 5.

Nor is the ordinance passed by the City Council laying the rate of $1.95 on the $100 for the City of Baltimore a valid and legal ordinance ; which is an answer to part of question 6. The tax rate of $1.81 ½ not having been fixed by an ordinance of the City and being the mere statement of a rate in the report of the Board of Estimates can have no force as a rate by which to levy taxes ; which answers question 8.

No reason is perceived for questioning the validity of the ordinance laying a rate of tax of 60 cents on the $100 on suburban property, &c.   None of the considerations which have been discussed have any reference to that.   It was duly passed by the Council and afterwards re-passed over the Mayor's veto.   The reference made in the ordinance to the tax rate fixed in the ordinance levying the taxes for the City of Baltimore passed at the same time with it is mere surplusage.   It is no essential part of the ordinance and can have no effect upon its validity.   This answers the remaining part of the inquiry in question 6.

We have been asked to construe section 85 of the Charter. We do not find however, that the construction of this section is involved in any of the inquiries that have been propounded to the Court, or that its construction is in any way necessary to determine the questions that have been presented by the record in the case.   If this section is to be pronounced invalid and void as has been suggested and argued, this ought not to be done by the Court, unless the question of its validity was directly or necessarily presented for decision.   If for any other reason than invalidity, it is incongruous or out of harmony with the system of which it is a part, this cannot be cured by construction.   More properly it is to be left to be reformed and made to consist with the system, by the power to which it owes its origin.

The case is before the Court upon a case stated under the provisions of Equity Rule 47.   The appeal is from a *pro forma* decree of Circuit Court No. 2, of Baltimore City.   This decree,

except as respects the ordinance for levy of taxes on suburban property, is inconsistent with the views herein expressed. It will be affirmed as to the ordinance last mentioned and reversed in all other particulars.

> *Decree affirmed in part and reversed in part, with costs to the appellants, and cause remanded that a decree may be passed in conformity with the opinion of this Court.*

(Decided February 21st, 1901.)