MAYOR AND CITY COUNCIL OF BALTIMORE, A MUNICIPAL CORPORATION, ET AL.,

. *vs.*

THE HAMPTON COURT COMPANY, A BODY · CORPORATE.

WILLIAM A. LARKINS, COMMISSIONER OF STREET CLEANING.

*vs.*

SAME.

*Board of Estimates of Baltimore City: may not repeal ordi-*
*nances.   Commissioner of Street Cleaning: removal of*
*ashes from apartment houses.   Dwelling house:*
*what is—.   City Charter: effect of—.*
*Municipal ordinance.*

By the ordinances of the Mayor and City Council of Balti-
more (Baltimore City Code, 1893, Art. 48, secs. 187-8), the duty
placed upon the Commissioner of Street Cleaning, to remove
offal, coal and other ashes, and to collect and remove garbage,
street and household refuse from dwellings and other places in
the City of Baltimore, is *mandatory* in character.          p. 343

Although by Chapter 123 of the Acts of 1898, large powers of control over the finances of the City of Baltimore were vested in the Board of Estimates, yet it does not enable that body, directly or indirectly, to repeal or nullify antecedent ordinances of the Mayor and City Council. p. 345

The adoption of the Charter of Baltimore City by Chapter 123 of the Acts of 1898 had no reference to validating invalid ordinances. It was merely intended to preserve the municipal statutes as to all laws and ordinances that might be in force at the date of the adoption of the charter, and to continue them in force in the passing of the corporation from the control of the old charter to that of the new, with the same effect, and no more, as if the change in the charter had not been made. p. 345

While the municipality of Baltimore may itself, by ordinance, amend or repeal any ordinance theretofore adopted, it is not within the power of any board, department or commission of the municipal government so to amend or repeal. p. 346

The Mayor and City Council, in the exercise of the police power, have the power to regulate the removal of ashes. p. 346

It is not competent for the Board of Estimates, by an arbitrary definition or classification of what is a "dwelling," so as to exclude certain apartment houses, to limit the right and duty of the commissioner to remove the ashes from apartment houses; as the duty is imposed upon him by the terms of the Baltimore City Code, Article 48, sections 187-188. p. 347

An ordinance of a municipal corporation duly passed in the exercise of a power delegated to the municipality amounts to a local law, and is just as binding and obligatory as if it had been adopted by the Legislature itself, and it may even prevail over a general law upon the same subject. p. 346

In classifying buildings, the usual line of demarcation for "dwellings" has been the use to which the building is devoted as a habitation for man. p. 347

*Decided June 22nd, 1915.*

Two appeals in one record from Circuit Court No. 2 of Baltimore City. (SOPER, C. J.)

The facts are stated in the opinion of the Court.

The causes were argued before Boyd, C. J., Briscoe, Burke, Thomas, Pattison, Urner, Stockbridge and Constable, JJ.

*Robert F. Leach, Jr., Assistant City Solicitor,* (with whom was *S. S. Field, City Solicitor,* on the brief), for the appellants.

*Albert C. Ritchie* and *Enoch Harlan,* for the appellee.

Stockbridge, J., delivered the opinion of the Court.

The question presented in this case is the power of the Board of Estimates of the City of Baltimore by making an inadequate provision in the ordinance of estimates to render impossible in part the performance of a duty imposed by ordinance upon one of the departments of the City government.

As the result of a large number of successive ordinances, the history of which it is not necessary to repeat in detail, the duty is imposed upon the Commissioner of Street Cleaning of removing offal, coal and other ashes, and the collection and removal of "garbage, street and household refuse from the dwellings and other places in the City of Baltimore," and also ice and snow from the gutters and street crossings, and from the front of the public schools, public buildings, bridges and public wharves belonging to the City, and the footways of the City springs and public squares. *Baltimore City Code,* 1893, Art. 48, secs. 187-8.

The terms in which this duty is placed upon the Commissioner of Street Cleaning are such as to make its discharge mandatory in character, under the uniform principles of construction frequently declared by this Court. For the purpose of performing this duty the Board of Estimates, in the preparation of the ordinance of estimates, has ever since the

creation of that board included an appropriation for the purposes enumerated. The amounts of those appropriations for a number of successive years are alleged in the supplemental bill of complaint, and practically admitted by the answers, to have been as follows:

"To the Commissioner of Street Cleaning:

Removal of Garbage:—

| 1910. | 1911. | 1912. | 1913. | 1914. |
|---|---|---|---|---|
| $ 60,500. | $ 62,500. | $ 64,500.00 | $ 66,500.00 | $ 68,500.00 |

Collection of Ashes and Garbage:

| 1910. | 1911. | 1912. | 1913. | 1914. |
|---|---|---|---|---|
| $185,000. | $210,000. | $216,954.22 | $227,483.22 | $227,483.22" |

It further appears in the evidence that in the ordinance of estimates for the year 1915 appears an item for the "collection of garbage $227,483.22," and it is further testified that this is the same appropriation as that made in the years 1913 and 1914, for the collection of ashes and garbage. Whether there was any appropriation for the year 1915 separate and distinct for the removal of garbage, corresponding to the appropriation made of $66,500, in 1913, and $68,500 in 1914, does not clearly appear. It will thus be observed that notwithstanding the steady growth in population of Baltimore, and the increased number of dwellings erected from year to year, the appropriation for the "collection of ashes and garbage" has remained constant at $227,483.22 for the years 1913, 1914 and 1915. That the appropriations made for 1913 and 1914 were adequate for the purpose, and more than adequate, appears from the fact that at the end of 1913 there was covered back into the City Treasury an unexpended balance of the appropriation, of $6,368.45, and for the year 1914 a like surplus of $1,906.81; while from all the appropriations made for the work of the Commissioner of Street Cleaning, there was covered into the City Treasury unexpended balances, and sums received for work done, amounting in the aggregate to approximately $70,000.

For sometime prior to the month of June, 1913, under the construction placed upon the ordinances, the Commissioner of Street Cleaning had removed at the City's expense, the ashes and garbage and household refuse from the dwellings in said City, from the apartment houses and from a portion of the hotels.   Under date of June 5th, 1913, a communication was sent to the Commissioner of Street Cleaning by the Board of Estimates which reads as follows:

"Commissioner of Street Cleaning:

"Dear Sir—The Board of Estimates at a special meeting, June 5th, again considered the question of removing ashes from buildings, and adopted the following ruling:  Houses not more than four stories in height and not having an elevator, used for dwelling purposes, even though they may be occupied by more than one family, should be classed as dwellings, and the Commissioner of Street Cleaning should take the ashes therefrom.   Houses more than four stories in height, used for dwelling purposes, occupied by more than one family, should be classed as apartment houses. The Board directs that you be governed accordingly."

This letter or "ruling" was very ingeniously worded; it did not in terms direct the Commissioner of Street Cleaning to cease removing ashes from hotels, apartment houses, office buildings or other large buildings in the City of Baltimore, but merely to give a definition of "dwellings."   It was evidently intended, however, to be interpreted by the Commissioner of Street Cleaning in connection with section 188 of Article 48 of the Baltimore City Code, 1893, which made it the duty of the Commissioner of Street Cleaning to remove the "coal or other ashes from the *dwellings* and other places." Acting upon this communication, the Commissioner of Street Cleaning discontinued and refused to remove ashes from certain apartment houses, from which he had theretofore been collecting and removing the same.   The present bill is filed for a prohibitive injunction against the Commissioner

of Street Cleaning to enjoin him from refusing to remove such ashes, and for a mandatory injunction requiring him so to remove them; also, for a prohibitive injunction against the Board of Estimates to restrain them from interfering with the Commissioner of Street Cleaning in the performance of a duty prescribed for him by ordinance.

While quite a number of actual or possible aspects of the case were argued before this Court, it is only necessary to consider one or two of them in order to reach a conclusion. Apparently it was the idea of the law officers of the City, that the adoption of the Charter, Chapter 123 of the Acts of 1898, by the large powers of control over the finances of the City which had been vested in the Board of Estimates, enabled that body indirectly to repeal or nullify antecedent ordinances of the Mayor and City Council. In *Baltimore* v. *Gorter,* 93 Md. 1, this Court fully reviewed the scheme contained in the City Charter for the administration of the City's finances, which renders it unnecessary at this time to repeat them in detail. But in *Bostock* v. *Sams,* 95 Md. 400, this Court had to deal directly with the effect of the adoption of the Charter, on ordinances existing at the time of such adoption, and it was then said that the provisions of the Act of 1898 had "no reference to validating invalid ordinances and was not intended to have such operation and effect. It was merely intended to preserve the municipal statutes as to all laws and ordinances that might be in force at the date of the adoption of the Charter and to continue them in force in the passing of the corporation from the control of the old Charter to that of the new with the same effect and no more as if the change in the charter had not been made."

Nor can it be supposed for one moment that it was the intention of the Legislature, in the adoption of the Charter, to vest in any of the subordinate boards created by that Charter, the power directly or indirectly to set at naught the performance of a duty imposed by ordinance upon any department or sub-department of the City government. An ordi-

nance of a municipal corporation duly passed in the exercise
of a power delegated to the municipality amounts to a local
law, and is just as binding and obligatory as if it had been
adopted by the Legislature itself, and it may even prevail
over a general law upon the same subject. *Gould* v. *Balti-
more,* 120 Md. 534. It is, of course, competent for the
municipality itself by ordinance, to amend, alter or repeal
an ordinance theretofore adopted, but it does not lie within
the power of any board, department or commission of the
municipal government, directly or indirectly, to so amend,
alter or repeal.

The evident purpose of the Board of Estimates was by an
attempted classification of buildings to relieve the city from
the burden and expense of collecting the ashes from a consid-
erable number of larger buildings, and particularly hotels,
apartment houses, factories, department stores and educa-
tional institutions and the like, and this purpose was sought
to be effected by framing a definition of what were to be re-
garded as dwellings. By that definition any structure oc-
cupied by more than a single family, as a place of habitation,
if it contained an elevator, or if it exceeded four stories in
height, was to be classed not as a dwelling, but an apartment
house. By this ruling it was sought to exclude certain build-
ings from being regarded as dwellings, and then inasmuch as
the ordinance which placed the duty of removing "coal and
other ashes" upon the Commissioner of Street Cleaning,
specifically named dwellings, it would follow that the Com-
missioner of Street Cleaning was under no obligation to re-
move the ashes from any apartment house that did not come
within the terms of the definition. This ignored the lan-
guage in the ordinance—"and other places," but it is not nec-
essary to rest the decision of this case upon those words.

There can be no question but what the municipality, the
Mayor and City Council of Baltimore, had the power by
ordinance to regulate the removal of ashes, in the exercise
of its police power. *Schultz* v. *State,* 112 Md. 211; *Haley*

348 M. & C. C. OF BALTO. vs. HAMPTON COURT.

Opinion of the Court. [126

v. *Boston,* 191 Mass. 291; *Rossberg* v. *State,* 111 Md. 394. It could amend, alter or repeal the existing ordinances on the subject, and subject to the limitation that such ordinances must be reasonable in their provisions, could classify the buildings from which such removal should be made at the public expense. By way of illustration, there are many and cogent reasons why the cost of the removal of manufacturing and commercial waste from factories and department stores should not be borne by the public at large, or even the refuse from hotels, which are without force in the case of the ordinary householders, and a number of cities have enacted regulations which recognize that distinction. But such classification is a power to be exercised by the municipal corporation as such through its legislative branch of government, not one resting in any Board of Commission of the municipality. Therefore, when the Board of Estimates made its ruling on the 5th of June, 1913, it acted *ultra vires* in so far as that operated or was intended to operate as a modification of existing ordinances, and the attempted ruling was void and of no effect.

But in addition to this the ruling of the board cannot be regarded in any other light than arbitrary. Many definitions have been given in adjudicated cases of a dwelling, and they are not entirely harmonious. The usual line of demarcation has been the use to which the building is devoted as a habitation for man. *N. Y. Fire Dept.* v. *Buhler,* 33 How. Pr. 378, 383; 35 N. Y. 177; *Davis* v. *State,* 38 Ohio St. 505-6; and cases collected in 3 *Words & Phrases,* 2288.

But in the present instance it is made to depend upon there being an elevator or not, if the structure is occupied by more than a single family, or upon the number of stories. Hence there may be two buildings side by side, of the same height, each occupied by three families, but the one having an elevator operated by hydraulic or electric power, the other without an elevator, and yet the one is to be classed as a dwelling entitled to have its ashes, garbage and refuse re-

moved by the city, and the other not. A more arbitrary discrimination it is difficult to conceive.

It remains to consider the effect of the failure of the Board of Estimates to include in the ordinance of estimates an appropriation adequate in the judgment of the Commissioner of Street Cleaning to perform the duties with which he is charged by the city ordinances. That such failure was the result of an accident is not claimed, on the contrary, it is boldly asserted in the brief on behalf of the city, that it was a deliberately planned omission, planned for the purpose of coercing the owners of apartment houses not coming within the board's definition of a dwelling, to bear the expense of the removal of the ashes from such houses.

It is no answer for the board to say that it provided an appropriation as large as the commissioner had asked for. The estimate submitted by him was made up upon the basis of what he understood to be the desire of the board, as evidenced by the instructions given to him. The inadequacy of the appropriation, therefore, if there should be any, is one for which the Board of Estimates, and that body alone, is responsible.

But is or will there be any such inadequacy? On that subject there is only the testimony of Mr. Larkins, and this is of the most unsatisfactory kind. It can not be described in any other way than guess work, without even the semblance of being the result of computation. But a few facts are to be discovered in his testimony; namely, that in each of the years 1913 and 1914 there was an unexpended surplus, of the appropriation for the removal of ashes and garbage, turned back into the City Treasury; that it has been a practice at times employed by him to divert some portion of an appropriation made for one purpose to another, and that it is his present plan to so divert $4,000 of the appropriation of $227,483.22 to the building of a new dumping platform. Nor are the figures given by Mr. Larkins as to the probable inadequacy of the appropriation for 1915 any more convinc-

ing. They range all the way from $12,693.72 to $250,000, an unusually large margin of variation; the smaller figure being the result he testifies, at which he arrived for adding to his work certain apartment houses in March, 1914; the latter as the result to follow for taking charge of the removal of the refuse of a considerable number of buildings for which no relief is asked in this case. Starting with the smaller sum referred to, he "estimates" the increased cost above the amount appropriated for the current year to be $20,000—in place of $12,693.72.

One further fact appears, not dependent upon Mr. Larkins' estimates, viz: that the ordinance making appropriations for the Department of Street Cleaning for the year 1915, contained this item, not embodied in the ordinance of any previous year: "Emergency fund:—to be expended only upon written orders of the Board of Estimates, $45,000."

The use of this is not restricted to any specific purpose, the disposition of it rests solely with the Board of Estimates, which can make use of it, or some portion of it for such purpose as it may deem proper. It may develop that the appropriation of $227,483.22 is inadequate for the proper performance of the work for which the appropriation was made, though the evidence of this is far from being satisfactory or convincing, but if that should happen there is nothing to prevent the Board of Estimates from employing some portion at least of this emergency fund for that purpose, indeed it would be its duty to do so, as the inadequacy of the appropriation was the result of the deliberate act of the board. This is upon the assumption that the appropriation as made shall prove actually inadequate, which the evidence falls far short of satisfactorily establishing.

The appellants laid much stress on the case of the *People* v. *Woodbury*, 88 App. Div. (N. Y.), 443, as being identical in all respects with and controlling of the present case. An examination of that case discloses a number of striking differences. In that case the Commissioner of Street Cleaning of

the City of New York gave notice that he would discontinue removing ashes and trade waste from "office buildings, whole-sale houses and department stores," without distinction as to their being large or small, and at the same time notice was given that the City would receive at the department dumps, the ashes from such buildings when hauled there by the owners. There was no attempt by arbitrary definition to exclude some and include others of the character of buildings mentioned. Dealing with this, the Court (PATTERSON, J.,) said: "But the City having assumed the duty, and the Commissioner of Street Cleaning being charged with the performance of that duty, a purely arbitrary discrimination in favor of some and against other inhabitants would not be tolerated. One citizen has as much right to the performance of the public service as another."

Failing to find any error in the decision of the Circuit Court No. 2 of Baltimore City, the decree appealed from will be affirmed as to both appellants.

> *Decree affirmed, costs to be paid by the Mayor and City Council of Baltimore.*