ARCADIA TELEPHONE COMPANY, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO, APPELLEE.

(No. 78-1121—Decided May 16, 1979.)

. *Messrs. Vorys, Sater, Seymour & Pease, Mr. James O. Seymour* and *Mr. Sheldon A. Taft,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. Thomas L. Mumaw,* for appellee.

*Per Curiam.* R. C. 4905.26, 4905.22 and 4905.381 authorize the commission to order telephone companies under its jurisdiction to establish Extended Area Service (EAS). See *Ohio Central Telephone Corp. v. Pub. Util. Comm.* (1957), 166 Ohio St. 180. As indicated earlier, the considerations that are weighed in coming to a final decision concerning the propriety of EAS are set forth in Chapter 4901:1-7, Ohio Adm. Code.[2]

---

[2]The pertinent provisions of Chapter 4901:1-7, Ohio Adm. Code, which appellant argues can deal with the subject of toll revenues, are Rules 4901:1-7-04(B) and 4901:1-7-05(A). Rule 4901:1-7-04 is entitled "General Considerations," and deals with factors that are noted in the determination of whether to order EAS. Subdivision (B)(1) reads:

"(B) Other pertinent factors:

"(1) Investment and cost considerations are of importance. It would not be in the public interest for a telephone utility to enter into exceptionally heavy investments in facilities and incur exceptionally high costs in situations where the 'extended area service' requirement was slight. Therefore, each of the factors must be evaluated in relation to all other factors. Timing is an important cost consideration and substantial weight must be given to plans for instituting the service in the most economical manner and at the most economical time."

Rule 4901:1-7-05 deals more specifically with "Rate Adjustments," and division (A) indicates:

The appellant has raised a sole proposition of law directed at the rates to be charged under the commission order, which reads: "The public utilities commission may not provide a new and improved service at rates which are unjust, unreasonable or in violation of law."

The crux of appellant's argument is that by ordering the institution of EAS, without allowing a tariff adjustment for the proposed loss in toll revenues, the commission has violated the provisions of R. C. 4905.22 and 4905.-381. Furthermore, the rates to be charged are confiscatory in violation of the Ohio and United States Constitutions.

The appellant contends that the $41,699 loss in toll revenues that will appear as a result of the introduction of EAS will wipe out its current annual return of $22,039 and will, in turn, force it to suffer a deficit. Arcadia argues further that the commission is required both by law and its own regulations to consider not only the expenses or cost of instituting the new service, but also any corresponding loss in revenues.

The scope of review required on an appeal from the Public Utilities Commission, mandated by R. C. 4903.13, dictates that an order of the commission will be overturned where, upon a consideration of the record, that particular order is either unreasonable or unlawful.

In *Ohio Central Telephone Corp.*, *supra*, this court recognized that when EAS is ordered, the record must reflect commission consideration of the "cost" of that new service in order for that administrative body to live up to its statutory responsibilities. The third paragraph of the syllabus of that decision reads as follows:

"The Commission recognized that the expanded 'local calling area,' resulting from the institution of 'extended area service,' is of value to the subscribers of the exchange involved. It further recognized that the service requires plant additions in each of the exchanges. It is, therefore, recognized that, where extended area service is instituted, rate adjustments may be necessary."

There is no express reference to lost toll revenues in these particular rules, nor any indication that it is an item requiring mandatory inclusion in the rates charged for EAS.

"In the situation described, the Public Utilities Commission possesses jurisdiction to fix or approve *fair and reasonable telephone charges* to the benefited subscribers of the affected exchanges *to meet any increased costs of providing such extended-area service* and has jurisdiction to adjust any differences or disputes which may exist or arise between the telephone companies involved, in the inauguration and rendition of such extended area service." (Emphasis added.)

Such a requirement is consistent with the provisions of R. C. 4905.22, which provides that all charges for service shall be just and reasonable.

In the more recent decision of *General Tel. Co.* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 154, this court was faced with a fact pattern similar to that presented by the current appeal. In that case the General Telephone Company objected to an EAS order, contending, at page 156, that "* * *the revenues generated by the service are completely inadequate to cover its costs." This court affirmed the commission order, although that order did not allow the utility any remuneration for lost toll revenues, and only considered the costs of the initial investment and those related to the installation and maintenance of such service. Although the issue of confiscation was not specifically addressed, the allegation that the rates permitted were "grossly inadequate" impliedly involved that question.

In the present appeal, the commission dealt at length with the issue of lost toll revenues in its order of May 18, 1978, and outlined several reasons for not including that figure in the calculation of the new EAS rates. In addition to various technical reasons justifying the exclusion, the commission concluded that any resulting impairment of Arcadia's rate of return could not be accurately ascertained in an EAS proceeding. The commission's analysis and rationale for excluding an adjustment for lost toll revenues was as follows:

"In its reply to complainants' exceptions to the Supplemental Attorney Examiner's Report, Arcadia argued

that constitutional requirements of due process require the continuity of prior revenues and the reimbursement of new expenses associated with the implementation of extended area service. The Commission does not agree. Reimbursement of new expenses for unbanded telephone companies providing extended area service is provided for in the Commission Rules; however, continuity of prior revenues and maintenance of a constant rate of return are not guaranteed a utility in the context of an extended area service case, or in normal daily activities. Revenues can rise and fall based on the number of subscribers, the type of equipment they subscribe to, the number and duration of toll calls made by subscribers and toll rates charged by telephone companies (e. g., Arcadia began charging higher rates for toll service following the completion of the last Ohio Bell rate case). Expenses can also rise and fall.

"To the extent that the loss of toll revenue impairs the involved utility's rate of return, that utility clearly has the statutory right to file for a rate adjustment pursuant to Chapter 4909 of the Ohio Revised Code. In the context of that proceeding, the burden of proof lies upon the utility to establish the merits of its request. Further, the Commission would have the benefit of a Staff Report and Investigation into the overall condition of the involved utility. Were the Commission to attempt to adjust rates in the context of an extended area service proceeding, it would at present not have the assistance of a Commission Staff Report, and would be viewing the impact of extended area service upon only a portion of the revenues of the involved utility, and probably little or none of its expenses. The burden of countering the telephone company's allegation of insufficient revenue would fall solely upon the complainants. The complainants do have the burden of proof in a complaint case but they should not be required to bear the additional burden of investigating the revenue requirements of their telephone company.

"Other reasons exist for not permitting lost toll revenue to be included in the rates. The inclusion of lost toll

revenues as a cost to be borne by subscribers has the effect of charging customers both for the new service facilities required for extended area service and for the old long distance service being discontinued.

"If lost toll revenue were included, timing would become an important factor for the complainants because the amount included would depend on when the subscribers asked the Commission to consider their request, e. g., the amount of lost toll revenue would be higher if the subscribers waited to file their case until their calling rate was six calls per main station instead of filing it when it was four. The amount of the lost toll revenue included can also depend on the length of time the case is pending before the Commission. At the time of the first hearing in this case in October 1973, Arcadia estimated that their lost toll revenue was $28,278. By the time the final hearings were held in April 1977, the lost toll revenue had risen to $41,699. The only reason the April 1977 hearings were scheduled was because the telephone companies had submitted technologically incompatible methods for instituting the requested extended area service at the October 1975 hearings.

"The institution of extended area service should create surplus toll equipment for a telephone company. Extended area service will result in a reduction of the number of toll calls made by subscribers but eventually the subscribers will increase their toll calls to other exchanges until the lost toll revenue is offset by increases in revenue from the remaining toll service. During this catch up period, a telephone company will reduce expenses because it will not have to install new toll facilities but can use the facilities made spare when toll usage decreased as a result of the institution of extended area service."

As illustrated by the foregoing, the character of an EAS proceeding is essentially that of an inadequate service case. A careful analysis of Arcadia's over-all financial condition would be necessary before a realistic assessment of the total impact of the new rates on its present

rate of return could be determined. The best method of assessing that impact is by way of a formal request for general rate relief. Such an approach would be particularly appropriate because R. C. 4909.15 has been amended since appellant's rate case in 1974, changing the method by which the statutory rate base is calculated.

It is also important to note that the new rates ordered by the commision will not go into effect until, 1980 and, thus, any alleged confiscation would not take place until that future date. During the interim there is nothing to prevent Arcadia from instituting the rate case concerning which its subscribers were forewarned in the letter describing the proposed costs of the new service. Moreover, should regulatory lag forestall appellant's attempt at timely relief, the commission would be empowered to grant emergency relief pursuant to R. C. 4909.16. See *Cambridge v. Pub. Util. Comm.* (1953), 159 Ohio St. 88.

The majority of the case law relied upon by appellant in support of its argument that the present rates are confiscatory deals with *rate* cases as opposed to petitions claiming inadequate service. See, *e. g., Elyria Tel. Co. v. Pub. Util. Comm.* (1953), 158 Ohio St. 441; *West Ohio Gas Co. v. Pub. Util. Comm.* (1935), 294 U. S. 79; *New York Tel. Co. v. Pub. Serv. Comm.* (1971), 29 N. Y. 2d 164, 272 N. E. 2d 554; *Boone County Rural Elec. Membership Corp. v. Pub. Serv. Comm.* (1959), 239 Ind. 525, 159 N. E. 2d 121; *Baltimore Transit Co. v. Hessey* (1950), 196 Md. 141, 75 A. 2d 76. Furthermore, we agree with the appellee that there is no reason to turn an inadequate service proceeding into a *de facto* rate case. There is nothing in the pertinent statutory language, the Ohio or federal Constitutions, or the commission's own rules that mandates the automatic inclusion of lost toll revenues in rates ordered pursuant to the institution of EAS.

In conclusion, Arcadia has failed to meet its burden in overcoming the presumption of lawfulness bestowed upon the commission's order. The rationale and conclusions concerning the question of toll revenues, expressed in the

May 18, 1978, order, being neither unreasonable nor unlawful, that order must be affirmed.[a]

*Order affirmed.*

CELEBREZZE, C. J., HERBERT, W. BROWN, SWEENEY and DONOFRIO, JJ., concur.

P. BROWN and HOLMES, JJ., dissent.

DONOFRIO, J., of the Seventh Appellate District, sitting for LOCHER, J.

[a]The commission addressed the issue of confiscation a second time in denying appellant's application for a rehearing. In paragraph No. 5 of that entry it capsulized its former analysis of that issue as follows:

"Arcadia's argument relating to unconstitutional confiscation of its property is without merit. As was stated in the Opinion and Order, the 'continuity of prior revenues and maintenance of a constant rate of return are not guaranteed a utility in the context of an extended area service case, or in normal daily activities.' While Arcadia estimated its annual toll loss to be $41,699, there was testimony by Ohio Bell * * * and the complainants * * * that the existing toll routes will, in the future, carry the same amount of toll traffic after the institution of extended area service as prior to the institution. Complainants described the time frame as 'within a short period of time' and Ohio Bell described it as 'soon.' Even an Arcadia witness admitted the possibility of recapturing the lost toll revenue in the future * * *. The testimony of Ohio Bell is most significant in this case because their toll equipment is joined directly to Arcadia's at the exchange boundary to form a continuous link between central offices. The Opinion and Order pointed out that just as a utility's revenues may vary, so may its expenses vary and the Commission believes that Arcadia's argument that 'if the schedule of EAS rates becomes effective, it prima facie will deprive Arcadia of its property without due process of law' cannot be considered a valid argument when considered within the limited scope of an extended area service proceeding. Before such a conclusion could be reached, the overall financial condition of the utility would have to be examined. No toll revenue loss can be incurred by Arcadia until the requested extended area service becomes operational and both respondents have estimated that approximately twenty-four months will be required to install the necessary equipment to provide the service."