# THE MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

*vs.*

# THE HAMPTON COURT COMPANY ET AL.

*City Ordinance—Removal of Ashes—Improper Discrimination.*

A city ordinance which limits to fifteen bushels per week the amount of ashes to be removed by the city from any dwelling house, apartment house, or tenement house, is not so capricious, oppressive, unreasonable, or discriminative as to invite or permit judicial interference.

*Decided April 6th, 1921.*

Appeal from the Circuit Court No. 2 of Baltimore City (DAWKINS, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Roland R. Marchant, City Solicitor,* and *George Eckhardt, Jr., Assistant City Solicitor,* with whom was *Simon E. Sobeloff, Assistant City Solictor,* on the brief, for the appellants.

*Enoch Harlan* and *R. Lee Slingluff,* with whom were *Robert W. Williams* and *Janney, Stuart & Ober* on the brief, for the appellees.

ADKINS, J., delivered the opinion of the court.

The single question in this case is the validity of Ordinance No. 55 of the Mayor and City Council of Baltimore, approved December 20th, 1915, which is as follows:

"An ordinance to add a new section to Article 36 of the Baltimore City Code of 1905, to be known as Sec-

tion 2-A, defining the duties of the Commissioners of Street Cleaning with reference to the collection and removal of ashes, and repealing all inconsistent ordinances.

"Section 1. Be it ordained by the Mayor and City Council of Baltimore, That a new section is hereby added to Article 36 of the Baltimore City Code of 1906, to be known as Section 2-A, to follow section 2, and to read as follows:

"2-A. It shall be the duty of the Commissioner of Street Cleaning to remove all ashes from dwelling houses, apartment houses and tenement houses, not exceeding fifteen bushels per week from each dwelling house, apartment house or tenement house, but it shall not be the duty of said Commissioner of Street Cleaning to remove more than fifteen bushels per week of ashes from any dwelling house, apartment house or tenement house, and it shall not be his duty to remove any ashes from any place other than a dwelling house, apartment house or tenement house.

"Sec. 2. And be it further ordained, That all ordinances and parts of ordinances inconsistent herewith are hereby repealed, to the extent of such inconsistency, and that this ordinance shall take effect from the date of its passage."

The question is raised by demurrer to the bill of complaint of appellees. The bill sets out a number of ordinances under which it was made the duty of the Commissioner of Street Cleaning to remove all ashes produced in Baltimore City, without regard to where they were produced or the quantity; that plaintiffs are the owners of large apartment houses in which many families reside and which produce more than fifteen bushels of ashes per week, but that notwithstanding appellees are large taxpayers and pay taxes in proportion to the value of their properties, and notwithstanding money has been appropriated yearly for the purpose of removing ashes, more than sufficient to enable the Commissioner of Street

Cleaning to remove all the ashes from their apartment houses and all others of like character, defendants have refused, and still refuse, to remove more than fifteen bushels per week from the large apartment houses, and plaintiffs have found it necessary to remove all of their own ashes and household and miscellaneous refuse therefrom.

The prayer of the bill is that said ordinance be adjudged and declared to be unreasonably and unlawfully discrimnatory, beyond the powers of the Mayor and City Council of Baltimore to ordain and enforce, and to be null and void; and that the defendants be enjoined and restrained from unlawfully discriminating against plaintiffs and other owners of apartment houses producing more than fifteen bushels of ashes per week, and from refusing to collect and remove the ashes and household and miscellaneous refuse from apartment houses in Baltimore City, and particularly from plaintiffs' apartment houses; that a decree may be passed in favor of plaintiffs against the defendants in the amount of expense incurred by plaintiffs in collecting and removing the ashes, household and miscellaneous refuse from their several apartment houses during the years 1916, 1917, 1918 and 1919, and for further relief.

It appears from the averments of the bill that, prior to 1913, all ashes were collected and removed by the City either by its own employees or by contractors. In the spring of that year the Board of Estimates directed the Commissioner of Street Cleaning to discontinue collecting and removing ashes and household and miscellaneous refuse and offal (other than garbage) from apartment houses in Baltimore City, and on the 5th day of June, 1913, the said Board of Estimates adopted the following resolution and directed the said Commissioner to comply therewith, viz:

> "Houses not more than four stories in height and not having an elevator, used for dwelling purposes, even though they may be occupied by more than one family, should be classed as dwellings, and the Commis-

sioner of Street Cleaning should take the ashes there-
from. Houses more than four stories in height used
for dwelling purposes, and occupied by more than one
family, should be classed as apartment houses."

This Court, in the case of *Mayor and City Council v.
Hampton Court Company,* 126 Md. 341, decided that the
Board of Estimates had no authority to pass such a resolution
in conflict with existing ordinances, and also that the resolu-
tion attempted to enforce an arbitrary discrimination. But
the court in that case said: "There can be no question but
what the municipality, the Mayor and City Councl of Bal-
timore, had the power by ordinance to regulate the removal
of ashes, in the exercise of its police power. *Schultz v. State,*
112 Md. 211; *Haley v. Boston,* 191 Mass. 291; *Rossberg v.
State,* 111 Md. 394. It could amend, alter or repeal the ex-
isting ordinances on the subject, and subject to the limitation
that such ordinances must be reasonable in their provisions,
could classify the buildings from which such removal should
be made at the public expense. By way of illustration, there
are many and cogent reasons why the cost of the removal of
manufacturing and commercial waste from factories and de-
partment stores should not be borne by the public at large,
or even the refuse from hotels, which are without force in
the case of the ordinary householders, and a number of cities
have enacted regulations which recognize that distinction.
But such classification is a power to be exercised by the mu-
nicipal corporation as such through its legislative branch of
government, not one resting on any board or commission of
the municipality."

Shortly after the above decision was handed down, Ordi-
nance No. 55 was enacted, and the bill in this case was filed
to test the validity of said ordinance.

The defendants demurred to the bill and from the order of
the learned Court below overruling the demurrer, this appeal
was taken.

Appellees concede that the Mayor and City Council of Baltimore have the power under the charter to regulate the removal of ashes and even to compel the removal of all ashes by the owners of dwellings and other buildings, but they strenuously urge that the enactment and enforcement of the ordinance in question was an arbitrary and discriminatory exercise of power, and therefore justifies the interference of a court of equity. With this contention we do not agree.

The argument in support of the charge of discrimination seems to be based on the theory that the removal of ashes by the City is undertaken as a matter of favor to householders, and on that theory it is contended that either all or none should be removed at public expense, because the work is paid for out of a common fund contributed by taxpayers, and therefore it is unjust to limit the number of bushels of ashes removed from a large apartment house, on which heavy taxes are paid, to that removed from a private dwelling bearing a much lighter burden of taxation. It is also argued that if sixty families elect to live in one house large enough to accommodate them, it is unreasonable to deny them the right to have all their ashes removed at public expense, while their neighbors who do not live in apartment houses, or in houses large enough to produce more than fifteen bushels of ashes, are relieved of the expense and trouble of providing for the removal of any part of such refuse.

The answer to both these arguments is that the partial removal of ashes by the City, as provided for in this ordinance, is not undertaken primarily as a matter of favor to individuals or to serve their convenience. If it were, the man who used gas or electricity instead of coal or wood might justly complain that he was being taxed to help pay for services rendered by the City to his neighbor who used ash-producing fuel, and the family living at a hotel might insist that it was being discriminated against.

As a practical proposition, however, the total amount paid annually by the appellees for the removal of ashes, as shown

by the record, is too small, when considered in relation to the number of families occupying the apartment, to be reflected in the rents paid by the tenants, and it is not believed they are substantially interested in the controversy.

The only justification for the use of public money at all in an enterprise of this sort is that it serves a public purpose. It is necessary that ashes be removed from time to time to protect the public from the nuisance which their accumulation would occasion—not to the householders as such, but to the public generally using the streets of the city.

How this shall be done is for the municipal authorities and not for the courts to determine.

It does not seem to be any more unreasonable to require owners of large apartment houses to provide for the removal of their ashes in excess of the amount produced by the owner of large dwellings, than to require hotels, factories and department stores producing large quantities, to remove the same, which as we said in *Mayor and City Council of Baltimore v. Hampton Court Co., supra,* they could be compelled to do.

As was said in *Harrison v. Baltimore,* 1 Gill, 264, and approved in *Baltimore v. Radecke,* 49 Md. 217, referring to the exercise by the City of its powers: "To their sound discretion was committed the selection of the means and manner (contributory to the end) of exercising the powers which they may deem requisite to the accomplishment of the objects of which they are made the guardians." In *State v. Curry,* 121 Md. 141, this Court said: "In determining the constitutionality of ordinances passed under the exercise of the police powers, courts must take into consideration the reasonableness of their provisions, and determine whether or not they are so unreasonable or oppressive as to cause the assumption that the Legislature did not intend to empower the municipality to enact them." See also *Radecke case, supra; Yick Wo v. Hopkins,* 118 U. S. 373; *Barbier v. Conolly,* 113 U. S. 27.

In the last mentioned case, where protection of the Fourteenth Amendment was invoked, it is said: "Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

We said in *Mayor and City Council of Baltimore* v. *Wollman,* 123 Md. 319: "The necessity and reasonableness of an ordinance, when passed in pursuance of the charter powers of a municipality, is primarily committed to the Council, and unless the ordinance is purely arbitrary, oppressive or capricious, the courts will not interfere to prevent its enforcement." See also *Etchison* v. *Mayor and Aldermen of Frederick,* 123 Md. 283.

We have examined carefully the cases cited by appellees. Their facts are entirely different from those in the case at bar.

We find nothing in the ordinance under consideration which the court can say is either capricious, oppressive, unreasonable or discriminating to such an extent, at any rate, as to invite or permit judicial interference.

We must, therefore, reverse the order overruling the demurrer to the bill of complaint.

> *Oder reversed and bill dismissed, with costs to appellants.*