## BALTIMORE TRANSIT COMPANY ET AL. *v.* HESSEY ET AL.

[No. 51, October Term, 1950 (Adv.).]

142

*Decided July 27, 1950.*

*Petition to stay mandate, filed August 8, 1950, denied August 29, 1950.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON and HENDERSON, JJ.

*Clarence W. Miles,* with whom were *Henry H. Waters* and *J. Stanislaus Cook* on the brief, for the appellants.

*Charles D. Harris, General Counsel to the Public Service Commission,* and *Philip H. Dorsey, Jr., People's Counsel,* for the Public Service Commission.

*John J. Ghingher, Jr., Assistant City Solicitor of Baltimore,* with whom were *Thomas N. Biddison, City Solicitor,* and *Edwin Harlan, Deputy City Solicitor,* on the brief, for the Mayor and City Council of Baltimore.

HENDERSON, J., delivered the opinion of the Court.

On January 4, 1950 The Baltimore Transit Company and its wholly owned subsidiary The Baltimore Coach Company applied to the Public Service Commission of Maryland for authority to increase its fares from a basic 12½ cent fare to a basic 15 cent fare per passenger. After an extended hearing the authority was denied on May 25, 1950, without prejudice to the submission of other proposals for changes in or modifications of the fare structure. The Companies declined to submit other proposals and appealed to the Circuit Court No. 2 of Baltimore City, where the case was heard upon the bill and demurrer of the Public Service Commission and the answer of the City of Baltimore, intervenor. From an order dismissing the bill filed June 13, 1950 an appeal was taken to this Court and advanced for prompt determination.

The complete transcript of testimony taken before the Commission, with exhibits produced by the parties, was filed with the bill of complaint. Judge Niles, in his written opinion, briefly disposed of any procedural difficulties in the following words: "My view is that the present order of May 25, 1950 is not procedural or interlocutory, and that it is a final order upon a basic question. Even though the present order extends an invitation to the Transit Company to submit further proposals, and is without prejudice to the right to submit such proposals, nevertheless if none are submitted, the order finally disposes of the case. The order is therefore appealable, and these proceedings are properly

brought." The appellees do not contend that the order was interlocutory, but argue nevertheless that the rejection of the applicants' proposal cannot be deemed confiscatory, since it left the door open for future proposals.

The evidence is perfectly clear and undisputed that under existing rates the Companies are operating at a loss. As stated by Judge Niles, "the essential fact is that the Transit Company is now operating at a loss of approximately $1,700,000 per year upon the present basic fare of 12½ cents and the Transit Company asserts that it is faced with bankruptcy unless the fare is raised to 15 cents. Expert testimony for the Transit Company indicates that such an increase in fare would reduce the number of passengers carried, but would probably result in a net profit of $952,100 per year, or a return of 3.1% upon the fair value, or rate base, of the Company of $30,554,000. Expert testimony for the People's Counsel indicates that while such an increase of fare would temporarily convert the present operating loss into a profit of $530,000, or 1.7%, nevertheless such relief would be only temporary; it would not constitute a permanent solution of the Transit Company's financial problem * * *". In its brief the Public Service Commission makes the flat admission: "Certainly, the present fares would be confiscatory if the Commission either approved them as a permanent fare basis, or rejected any reasonable method of financial relief proposed by the company. There is no dispute on this point." Nor can there be any dispute that the proposed increase in revenues would not yield an excessive return, or even a reasonable return, upon the value of the Companies' property. Manifestly, an operating deficit cannot be converted into a profit except by an increase in operating revenue, derived almost wholly from fares, or by a decrease in operating expenses.

The Commission possesses a wide discretion to approve or disapprove a particular rate schedule and its decisions are prima facie correct. But an order will be set aside

if the Commission exceeds its jurisdiction or arbitrarily disregards the rights of the parties. *Hessey v. Capital Transit Co.*, 193 Md. 265, 270-271, 66 A. 2d 787, 789, 10 A. L. R. 2d 1114, and cases cited.

In that case we held that the Commission's refusal to permit the abandonment of an unprofitable line was unreasonable and arbitrary under the circumstances. In the earlier case of *Capital Transit Co. v. Bosley,* 191 Md. 502, 510-511, 62 A. 2d 267, 271, we held that an order rejecting an application for a general fare increase was unlawful, where the Company was losing money on its operations in Maryland, because conditioned upon the allowance of a 3-cent fare for school children, less than cost. It was said: "We think it is impossible to justify the three-cent fare for school children and that the Commission's order is arbitrary, unsupported by substantial evidence and unlawful. The Commission's opinion demonstrates that the existing fares are unreasonable and the new fares are not more than reasonable. Yet its order purports to find that existing fares are reasonable *until* fares for school children are decreased and plaintiff's losses thus increased". In both of these cases the fact that the Company was operating at a loss was the controlling factor which made denial of the relief sought unreasonable.

The Commission argues, however, that it acted within its powers in rejecting the proposal because it invited alternate proposals looking towards an increase in fares. But the result was to continue in effect the confiscatory rates, without any present relief. *Augusta-Aiken Ry. etc., v. R. R. Comm.,* 4 Cir., 281 F. 977 (C. C. A. 4). "Present confiscation is not atoned for by merely holding out the hope of a better life to come." *West Ohio Gas Co. v. Public Utilities Comm.,* 294 U. S. 79, 83, 55 S. Ct. 324, 325, 79 L. Ed. 773. "The continued enforcement of the rate would operate to take appellee's property without just compensation, and to compel it to suffer daily confiscation. Notwithstanding the matter was pending on rehearing, the appellee had the right to sue in the

federal court to enjoin the enforcement of the rate. It was not bound to await final action by the commission, and, if the rate was in fact confiscatory, to serve in the meantime without just compensation." *Banton v. Belt Line,* 268 U. S. 413, 45 S. Ct. 534, 535, 69 L. Ed. 1020. "It is as clear a violation of the Constitution, and one as promptly remediable in the national courts, to take the property of a railroad company without just compensation by the enforced operation of tentative rates during the process of their making as by the operation of final rates after that process is complete." *Love v. Atchison, Topeka & S. F. R. Co.,* 8 Cir., 185 F. 321, 327 (C. C. A. 8).

The case of *City of Pittsburgh v. Penn. P. U. C.,* (Pa. Sup. Ct.), 165 Pa. Super. 519, 69 A. 2d 844, relied on by the appellees, is not to the contrary. There the proposed rate had been put into effect by the Commission, and the remand of the case for further consideration of a proper rate schedule left the schedule as proposed and approved in effect. The remand was apparently based solely on the ground that the evidence did not show affirmatively that the rates were non-discriminatory, presumably a requirement of the Pennsylvania Statute. But the Court seems to have recognized that rates need not be proportionate to the distance travelled. We have held that a classification of rates is permitted but not required. *Lewis v. Mayor & City Council of Cumberland,* 189 Md. 58, 68, 54 A. 2d 319.

The Commission seems to have recognized the difficulty, for it said: "The Company will no doubt feel that it should not be denied any relief pending the studies along the lines suggested. * * * Although the Company will sustain some loss in the period in which the necessary studies are made to determine a proper and non-discriminatory fare, it should not forget that it did earn, in war years, at an abnormally high rate. * * * The Company has at hand reserves, created out of high profits, for the avowed purpose of financial relief during such a time and economic situation as that in which the Company now finds itself." The mandate that the Com-

pany meet operating deficit out of its reserves for deferred maintenance, depreciation and contingencies is patently inappropriate. "The law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future". *Bd. of P. U. Comm. v. New York Tel. Co.*, 271 U. S. 23, 32, 46 S. Ct. 363, 366, 70 L. Ed. 808.

But if we assume, without deciding, that immediate relief might be deferred under some circumstances, we find no justification for such action in the instant case. Having found the present rates to be confiscatory, if the proposed increases were unacceptable, it was incumbent upon the Commission to adopt an adequate substitute, or to grant temporary relief pending its final determination. *Cf. Dayton Power & Light Co. v. P. U. C.*, 292 U. S. 290, 294, 54 S. Ct. 647, 78 L. Ed. 1267. Moreover, there is no assurance that a zone system would be acceptable, or would not equally stimulate customer resistance.

Mr. Roberts, the expert produced by the People's Counsel was asked whether he had any specific proposal for a plan of transit fares as an alternative to the flat 15 cent fare proposed. He replied: "No, I have not worked out any specific proposal. For one reason, the working out of such a plan and estimating the revenues to be derived from such a plan requires detailed study of the movement of passengers over all the Company's routes. This information is necessary in order to establish the fare zone limits, the rates per zone, and the probable operating revenue. This work had to be done with extreme care in order to avoid the establishment of fares that would produce far less revenue or far more revenue than was proper and in order to avoid a violent public reaction to a system of fares that would be basically different from the system now in effect. A second reason that I have not worked out any specific proposal is that the purpose of my employment is primarily to assist People's Counsel in his consideration of the application

of the Company for a 15-cent fare. The third reason is that there has not been sufficient time since my employment to work out a definite alternative plan." It may be noted that a flat rate system, with certain zone fares in outlying districts, has been in effect in Baltimore for more than 40 years, and that this system is the one in use in most of the metropolitan areas of the country. Even if we accept Mr. Roberts' thesis that a flat increase would tend "to discourage the profitable shorthaul passengers and to retain the unprofitable long-haul passengers", he was not prepared to present a workable alternative to the Company's proposal.

The main contention of the appellees seems to be that a 15-cent fare would not solve the Company's financial problem, but on the contrary would result in adverse and even ruinous effects upon the Company's revenues, patronage and service. Mr. Roberts testified that "the Company's passenger traffic is going steadily downward due to causes entirely apart from the fare increase, these causes being characterized as an economic downward trend. It is obvious that if the prevailing economic trend continues throughout 1950, the Company's traffic will be 9.5 per cent less at the end of December 1950 than it was at the beginning of 1950, and that the Company will be in need of further relief in 1951 merely to offset the loss of revenue from passengers who withdrew their patronage purely because of the continuance of the so-called downward economic trend." Economic trends can never be accurately predicted, certainly not in a period of wars and rumors of wars. But if it be true that the decline in passenger traffic will continue as indicated, regardless of the fares charged it does not follow that the Company must continue in the meantime to operate at a loss. A blood transfusion can hardly be refused solely because in the end the patient may die of an incurable disease. Mr. Roberts admitted that despite the probable loss of passengers from both customer resistance and economic trend, the proposed plan would produce an operating profit for a year at least.

If it were established that the end was in sight and the Company moribund, then it might well be contended that since the Company had no value as a going concern, no rate base could be established, and the denial of a reasonable return on the investment would not be a violation of due process. That seems to have been the situation in *Market Street Railway Company v. Railroad Comm. of California,* 324 U. S. 548, 65 S. Ct. 770, 780, 89 L. Ed. 1171, relied on by the appellees, where the court said: "Apart from a little brief war-time prosperity, it seems doubtful whether any rate would yield appellant's operating expenses. Under these circumstances we do not find that anything has been taken from the appellant by the impact of public regulation. If the expectations of the Commission as to traffic increase were well founded, it would earn under this rate on the salvage value of its property, which is the only value it is shown to have. If expectations of increased traffic were unfounded, it could probably not earn a return from any rate that could be devised. We are unable to find that the order in this case is in violation of constitutional prohibitions, however unfortunate the plight of the appellant."

In *Capital Transit Co. v. Bosley, supra,* 191 Md. at page 513, 62 A. 2d at page 272, we refused to apply the "moribund" principle to a utility merely because its proposed increase in fares would still be insufficient to yield any return on the value of the property.

In the instant case the Company has not reached the point where there is no public need for its services. Indeed, it is carrying more passengers today than in any year prior to 1942, although there has been a decline in each year since the peak in 1943. The appellees argue that an increase in fare will accelerate this trend and offset the effect of the increase. They base their contention on the sharp drop in 1949, following the increase from a 10-cent to a 12½-cent base fare in January of that year. An analysis of the figures shows, however, that although the Company had an operating loss in

1948 of about $1,310,500, in 1949 their operating income was $621,700, despite the loss of passengers. The present operating loss in 1950, is due almost wholly to wage increases. Moreover, all of the witnesses agree that the proposed fare increase will turn the present operating loss into a profit, though they vary in their estimates as to the amount, the more optimistic estimates being those presented by the Company. We may assume that the Company is not obsessed with suicidal tendencies, but on the contrary is trying desperately to survive. To this end it has admittedly effected large economies in operation, though possibly at the cost of service rendered. In *Warren v. Fitzgerald,* 189 Md. 476, 56 A. 2d 827, we discussed the history of the Company, and particularly its plan to abandon 46% of its trackage and substitute bus transportation to meet the threat of automobile competition. Mr. Roberts admitted that almost every suggestion he made in 1948, for improvements and economies in operation, had been adopted. Within the limits of reasonable regulation, it is fundamental that the solution of business problems rests squarely upon the shoulders of private management, not with the public authorities.

Upon a careful review of the record, we think the order of the Commission cannot be sustained. The proposed schedule of rates is not shown to be out of line with those charged in other comparable cities, of which Washington, D. C., is one. It is not shown that the proposed fare will yield an unreasonable return or that it will be ineffective to produce an operating profit at least for the current year. The present rate is admittedly confiscatory and hence unlawful. To defer relief pending a protracted further study is arbitrary and unreasonable. In reversing the Commission's order, however, we express no opinion as to the extent to which the approval of the proposed schedule may be conditioned upon further study of a zone system, or any other workable alternative, including improvement in service and the cultivation of good-will which the commission stressed in its opinion.

Nor do we mean to belittle the opinions of the experts, based upon experience in other sections of the country, that a mere increase in fares may not be the final answer. The record shows conclusively that the maintenance of an efficient transportation system is a public necessity. If it is to survive in private hands, all of the interested parties must cooperate to solve the financial problems involved.

*Order reversed, with costs.*