HOFFMAN *v.* MAYOR AND CITY COUNCIL OF
BALTIMORE ET AL.

[No. 94, October Term, 1950.]

*Decided March 14, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Southey F. Miles* and *H. Richard Smalkin,* with whom were *Smalkin & Hessian* on the brief, for the appellant.

*Francis J. Valle, Assistant City Solicitor of Baltimore,* with whom were *Thomas N. Biddison, City Solicitor,* and *Edwin Harlan, Deputy City Solicitor,* on the brief, for the appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Julius Hoffman, from an order of the Baltimore City Court affirming the decision of the Board of Municipal and Zoning Appeals, (the Board), which denied a permit to use a portion of the lot, zoned residentially, located at 3420 Fourth Street in Baltimore City, for the storage of building materials.

The appellant is a part owner, with others, of the lot of ground here in question, which is zoned partly for industrial use and partly for residential use. The total lot has a frontage of 299 feet on Fourth Street. It is bounded on the north by the right-of-way of the Baltimore and Ohio Railroad, on the west by a vacant lot, zoned industrially, and on the south by a vacant lot,

zoned residentially, and Arsan Avenue. South of Arsan Avenue are seven dwellings fronting on Maude Avenue with their rear toward Arsan Avenue, zoned residentially. Across Fourth Street there is another vacant lot, zoned residentially and, according to the testimony, a very poor location for houses. It already fronts on this lumber yard. The appellant has a legal existing use and actually uses the north portion of this lot, consisting of 32,450 square feet and fronting 179 feet on Fourth Street for the storage of building materials with an office building located thereon. The remaining part of the lot, containing 43, 350 square feet, sought to be re-zoned, fronting on its east side 120 feet on Fourth Street and running back westerly 363 feet 2 inches to a vacant lot in the Industrial Zone, is vacant and zoned residentially. It is bounded on the south by a vacant lot, zoned residentially, and Arsan Avenue. South of Arsan Avenue are the seven houses fronting on Maude Avenue, zoned residentially. It is bounded on the north by the remaining part of the lot, zoned industrially, and on the west by a vacant lot, zoned industrially. Appellant, when he purchased this whole lot in question in 1948, was informed at the City Hall Zoning Division, and the Use District Map showed, according to the testimony, that the part of the lot here sought to be zoned second commercially, was "all right to use for the storage of building materials". Consequently, appellant signed the contract of sale and paid one thousand dollars on the purchase price. Before settlement, he found out that part was zoned residential and rather than forfeit the deposit, he completed the purchase. This part of the lot had actually been zoned residentially since the Baltimore City Zoning Ordinance No. 1247 was adopted, effective March 30, 1931. On February 8, 1949, the appellant appealed to the Board for a permit to construct a six foot fence around the part of the lot zoned industrially and that part now sought to be zoned second commercially. This permit was approved and the fence has been built.

The appellant previously appealed to the Board for permit to use the Residential Use portion of the lot for the storage of building materials. On December 6th, 1949, appellant dismissed the appeal for that permit. On February 23, 1950, the appellant made application to the Building Inspection Engineer of Baltimore City for a permit to use the area of the lot in question which is zoned residentially for the storage of building materials in connection with the existing storage of building materials on the remainder of the lot. The Zoning Commission rejected the permit and the appellant appealed to the Board for an order authorizing an exception to the requirements of the Zoning Ordinance. At the meeting of the Board, three members voted to grant the permit and two members voted to deny it. As the Zoning Ordinance requires the vote of four members to reverse the action of the Zoning Commissioner, his disapproval of the permit was approved and the permit denied. On appeal from the decision of the Board to the Baltimore City Court the case was heard on the transcript of the record of the proceedings before the Board and no additional testimony was taken. However, by agreement of counsel, Zoning Ordinance No. 1247, effective March 30, 1951, with the amendments thereto, was offered in evidence. From the order of the Baltimore City Court sustaining the decision of the Board and denying the permit, the appeal comes to this Court.

In the testimony before the Board, Mr. Magee, engaged in the real estate business and also an appraiser, testified that the part of the lot in question here was most suitable for industrial purposes and that he considered it unreasonable for it to be zoned for residential use. He also said that someone could build a house thereon as there was enough area, but it would be unwise and wasteful use of the land. He said in his opinion zoning this portion of the lot for residential use takes away between $3,500.00 and $3,600.00 from the value of the property sought to be rezoned. He also said that zoning it for industrial use and making the lumber yard

larger would not have any substantial effect on the value of the residences on Maude Avenue and would not in any way jeopardize the health and safety of the surrounding property. Another witness offered by the appellant, Mr. Cox, a real estate broker and a member and a director of the Real Estate Board of Baltimore, testified that the most suitable use of the area in question would be for industrial or second commercial purposes. He said the whole neighborhood tends to industrial uses in spite of the fact that there are residential properties on Maude Avenue, which in his opinion are "mis-located" and have already been depreciated in value by the industrial activities in the neighborhood. He said houses could be built there but "no right minded speculative builder would dare build a house there because his market price would be less perhaps actually than his cost." He said the use of the area for storage of building material would not jeopardize the safety or welfare of the immediate community and that the present zoning was injurious to the owners of the lot. He said he did not think industrial zoning of this lot would injure the residences on Maude Avenue. Testimony was also offered that the value of the whole lot including the part zoned as industrial and residential is $10,730.00 and, if the whole lot was zoned as industrial, the value would be $14,250.00.

On the other hand, Mrs. Lewis Yerka, one of the protestants who lived on Maude Avenue said: "Why wouldn't a home on the residential ground of the junk yard why should that be depreciated if the property on Maude Avenue would not be depreciated?" Mr. Freburger, one of the City Councilmen from Baltimore City, who protested the application, testified that they had tried "to change some of the areas so there may some day be a buffer between the residential and the industrial sections. This is one of those particular cases where we had hoped something may develop there." He further indicated that the pictures offered in evidence were misleading. Mr. Hammerman, a member of the Board, re-

plied: "Mr. Freburger, we have seen the property, the pictures do not fool anybody, we have seen it." The evidence further shows that there are no schools nearby, that there is a fire hydrant immediately in front of the lot, a fire engine house four or five squares away. There is adequate police protection. The Board found: "Considering all the testimony on both sides, the argument of counsel and the provisions of the Ordinance applicable to this case, the Board finds that the portion of the lot in the Residential Zone appears to be a *buffer* between the Industrial Zone and the industrial uses to the north of the Residential Zone and the dwellings to the south, and dwellings and land to the east; that the facts do not warrant making the exceptions which the Board is authorized to make by authority of Paragraph 12; that the facts which have been described tending to classify this lot as one limited as to location are not of the degree sufficient to justify permitting an Industrial use in a Residential District immediately to the rear of the lots in the latter district already developed with dwellings, and therefore it sustains the action of the Zoning Commissioner in disapproving the permit." (Italics supplied).

Of course, the mere fact that the present zoning makes the property less profitable, is not sufficient ground alone to change the zoning. *Easter v. Mayor and City Council of Baltimore,* 195 Md. 395, 400, 73 A. 2d 491, 492. In *Francis v. MacGill,* 196 Md. 77, 84, 75 A. 2d 91, 94, the owners had knowledge of the zoning regulations and completely ignored them. It was said in that case: "We cannot say, from the evidence in the case at bar, that the action of the Commissioners, in drawing the line where they did, was unreasonable, arbitrary and capricious. If where they drew the division line in this case is fairly debatable, their action must be sustained." It was said in *Board of County Com'rs of Anne Arundel County v. Snyder,* 186 Md. 342, at page 346, 46 A. 2d 689, at page 691, in sustaining residential zoning: "We

cannot say that the restriction to residential use is arbitrary and unreasonable; at most the question seems 'fairly debatable'. *Zahn v. Board of Public Works,* 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074."

It was recently said in the case of *Northwest Merchants' Terminal, Inc. v. O'Rourke,* 191 Md. 171, 187, 60 A. 2d 743, 751, "Lines between use districts must be drawn somewhere. It is common knowledge that, long before zoning and ever since, residential neighborhoods have bordered on commercial or industrial neighborhoods. Sometimes the borders of restricted neighborhoods are protected from undesirable adjoining neighborhoods by landscaping or architectural plans. If a residential neighborhood desires protection by a border of unused property, necessarily it must provide its own property, not appropriate its neighbors' for this purpose. 'In order to impose restrictions some valid exercise of the police power must be proven. But such power is invoked for the protection of the property restricted and not to give protection to surrounding property.' *Chayt v. Maryland Jockey Club,* 179 Md. 390, 395, 18 A. 2d 856, 858. Property owners in a Residential district cannot create a 'no man's land' at the border of their own district by forbidding one property owner in an adjoining district from making any use at all of his property, or any use for which it is 'peculiarly suitable'—especially when the adjoining district has been zoned for different suitable uses for fifteen years."

In the case of *Northwest Merchants' Terminal Inc. v. O'Rourke, supra,* this Court quoted the following from the opinion of Judge Lehman (later Chief Judge) in the case of *Arverne Bay Construction Company v. Thatcher,* 278 N. Y. 222, at page 232, 15 N. E. 2d 587, 117 A. L. R. 1110: "We have already pointed out that in the case which we are reviewing, the plaintiff's land cannot at present or in the immediate future be profitably or reasonably used without violation of the restriction. An ordinance which *permanently* so restricts the use of property that it cannot be used for any reasonable pur-

pose goes, it is plain, beyond regulation, and must be recognized as a taking of the property. The only substantial difference, in such case, between restriction and actual taking, is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden."

In the case of *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 448, 72 L. Ed. 842, Nectow owned a lot in Cambridge, Massachusetts. Under the zoning ordinance part of the lot was zoned residentially and part was left unrestricted. The Master's report stated that no practical use could be made of any part for residential purposes and that such zoning would not promote the health, safety, convenience and general welfare. The Supreme Judicial Court of Massachusetts reversed the Master. The Supreme Court of the United States reversed the Supreme Judicial Court of Massachusetts and said: "It is made pretty clear that because of the industrial and railroad purposes to which the immediately adjoining lands to the south and east have been devoted and for which they are zoned, the locus is of comparatively little value for the limited uses permitted by the ordinance. * * * The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare. * * * That the invasion of the property of plaintiff in error was serious and highly injurious is clearly established; and, since a necessary basis for the support of that invasion is wanting, the action of the zoning authorities comes within the ban of the Fourteenth Amendment and cannot be sustained."

In *Ellicott v. Mayor and City Council of City of Baltimore,* 180 Md. 176, 183-184, 23 A. 2d 649, 652, this Court sustained an exception and allowed the erection of a filling station in a residential district because the nearest filling station was half a mile distant and to facilitate

traffic. Chief Judge Bond said in that case: "Section 5 of the enabling act, Code, Art. 66B, provides that the zoning regulations, restrictions and boundaries for the districts with which the act deals may from time to time be amended, supplemented, changed, modified or repealed, under specific conditions. The change or modification of boundaries, properly construed, would not, in our opinion, include the cutting out of a single lot, *unless perhaps the lot should stand at the boundary of the district, and the segregation might thus be a change of the boundary itself.* But the power to change or modify a restriction applicable to a district must include the power to relieve a particular lot from it if the peculiar conditions of that lot or the public good requires it. If a lot should be susceptible of only a use different from that prescribed for the district, the special hardship of a prohibition of that use might justify an exception from the general restriction. * * * And a question of reasonableness of the municipality's exercise of the power under the enabling act might also present itself. *State v. Gurry,* 121 Md. 534, 541, 88 A. 546, 47 L. R. A., N. S. 1087, Ann. Cas. 1915B 957; *Baltimore v. Hampton Court Co.,* 138 Md. 271, 113 A. 850, 15 A. L. R. 304; *Dowsey v. Village of Kensington,* 257 N. Y. 221, 177 N. E. 427, 86 A. L. R. 642. * * *

"In argument it has been urged that the invasion by one filling station will, according to the ordinary course, be followed by others, probably by one on each corner of the intersection, to the further reduction in character of the district, but that does not follow. A finding that one filling station may meet a public need does not mean that others would be justified, at least while the district continues zoned as a residential one." (Italics supplied.)

Of course, it is well established that the Court will not substitute its discretion for that of the Board. *Heath v. Mayor and City Council of Baltimore,* 187 Md. 296, 304, 49 A. 2d 799. In the case now before this Court three members voted to grant the permit and two members

voted to deny it. This Court said in *Mayor and City Council v. Biermann*, 187 Md. 514, at page 522, 50 A. 2d 804, at page 808: "We are inclined to agree that where disapproval rests upon a mere failure to obtain the concurring vote of four out of five members, the action cannot properly be described as that of a fact-finding body. In such circumstances it would be more accurate to say that approval is prevented by the exercise of a veto power. And negative action of this sort is clearly not entitled to the same weight, in considering the merits of a controversy as a positive determination."

In the case now before this Court, the only residences possibly affected are the "mis-located" houses on Maude Avenue which back up to Arsan Avenue. These houses have already been depreciated in value by the industrial activities in the neighborhood. There is no evidence here that these residences will be injuriously affected if the permit is granted. It is admitted by a member of the City Council that the part of the lot in question was zoned as a "buffer" between the residential and the industrial sections and the Board so found. This is not a valid reason for residential zoning. *Northwest Terminal, Inc. v. O'Rourke, supra,* 191 Md. 187, 60 A. 2d 743. The division line between the zones in this case is not "fairly debatable". *Board of County Com'rs of Anne Arundel County v. Snyder, supra,* 186 Md. 346, 46 A. 2d 689; *Francis v. MacGill, supra.* All the testimony here shows that to build residences on the lot here in question would be an unwise and wasteful use of the land. *Arverne Bay Construction Company v. Thatcher, supra.* All the testimony here shows that if the permit here sought is granted the public health, safety, and morals or general welfare of the community or surrounding property will not be jeopardized. *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842, *supra.* It appears that the zone division line here in question was wrongly laid down in 1931. The twenty years that have elapsed since that time have confirmed this. It has never been used for residential purposes and

there is no evidence that it will ever be used for residential purposes. All the evidence points to the contrary. The Courts are not limited to the exceptions under the Zoning Ordinance. The special hardship in the prohibition of a use here justifies an exception from the general restriction. *Ellicott v. Mayor and City Council of City of Baltimore, supra.* Here the district is primarily industrial.

This case originated in an application to the Board of Municipal and Zoning Appeals for a permit, under provisions of the Zoning Ordinance for special "exceptions", to use for second commercial purposes certain property zoned as residential. Stated most simply, the question now presented is whether the Zoning Ordinance, as applied to this property, now is (i. e., originally was in 1931, or has since become) invalid. Such a question ordinarily may or must be raised by bill in equity, but it may also be raised on appeal from the zoning board, although (it is said) it may not be heard before the board. *Ellicott v. Mayor and City Council of City of Baltimore, supra,* 180 Md. 180, 181, 23 A. 2d 649. Application for an "exception" is an appropriate way to raise such a question. This Court has never held that, in view of *Sugar v. North Baltimore Methodist Protestant Church,* 164 Md. 487, 165 A. 703, the provisions for "exceptions" in the present zoning ordinance are valid. We have several times held that, assuming the validity of these provisions, the facts did not warrant an exception by the board. In June, 1950, the Supreme Court of Rhode Island held a provision for exceptions in a Pawtucket zoning ordinance invalid as too broad a redelegation of delegated power, but apparently held valid another provision not so broad. *Flynn v. Zoning Board,* R. I., 73 A. 2d 808. Whether or not these provisions of the ordinance, especially those of paragraph 33(c) rather than 33(b), are in other respects wholly or partially invalid, they are valid at least to the extent of authorizing the board to make "exceptions" when the law itself would make exceptions by holding the ordinance *pro*

*tanto* invalid. On appeal from the board, *Ellicott v. City of Baltimore* makes it unnecessary to consider "exceptions" as such, but permits the validity of the ordinance, as applied, to be determined.

An ordinance or administrative order or a statute may be valid at one time and place, under certain conditions, and invalid at another time and place, under other conditions. *Kramer v. Mayor and City Council of Baltimore,* 166 Md. 324, 333, 171 A. 70; *Baltimore Transit Co. v. Hessey,* 196 Md. 141, 75 A. 2d 76; *Lincoln Gas Electric Co. v. City of Lincoln,* 250 U. S. 256, 268, 39 S. Ct. 454, 63 L. Ed. 968; *Newton v. Consolidated Gas Co.,* 258 U. S. 165, 174, 42 S. Ct. 264, 66 L. Ed. 538. A zoning statute, ordinance or administrative order, like other action in the exercise of the police power, is presumed to be valid unless on its face or by extrinsic facts it is shown to be invalid. The mere fact that an exercise of the police power may cause expense or loss to an individual does not overcome the presumption of validity. But the duty of the courts not to substitute their judgment for the judgment of legislative or administrative authorities acting within their powers is no more imperative than the power and duty to set aside any purported exercise of such power which is in fact arbitrary, capricious or confiscatory. In this respect zoning can no more escape judicial review than any other purported exercise of the police power. The legal question is whether the legislative or administrative determination was "an unreasonable, arbitrary or unequal exercise of power". But when it is shown "that the health, safety, convenience and general welfare of the inhabitants of the part of the city affected will not be promoted" by inclusion of land in a residential district, thereby inhibiting its use for commercial and industrial purposes to the serious damage of the owner, such zoning may be set aside. *Nectow v. Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842, *supra; Anne Arundel County v. Ward,* 186 Md. 330, 338, 46 A. 2d 684, 165 A. L. R. 816; *Northwest Merchants' Terminal v. O'Rourke, supra.*

The evidence in this case is not conflicting or hard to interpret. As hereinbefore stated, the only tangible reason given in support of the board's minority veto is the establishment of a "buffer" to protect the residences on Maude Avenue. This is no more lawful in original zoning than in re-zoning. *Northwest Merchants' Terminal v. O'Rourke, supra.* Photographs and the plat itself strongly support real estate testimony that the Maude Avenue residences were "mislocated" and thus indicate that the zoning of the *locus* now in question was originally invalid in 1931. We need not decide this question, but may assume that this original zoning was justified by hope that the *locus* might follow the use of the Maude Avenue property and not the use or non-use of the property adjoining on other sides. Any such hope has been blasted by time. The *locus* is surrounded on two sides by property zoned as residential. But there is no evidence that since 1931 any residence has been built on any side. On the southeast side of Fourth Street, above Arsan Avenue, the only use of any of the property zoned as residential is a nonconforming use. On Maude Avenue itself the gaps in the uncompleted row of houses have never been filled. Twenty years is enough to convert a trespasser into an owner. It is enough to demonstrate the futility of hope that the *locus* will be used for residential purposes, and that it is *now* arbitrary to zone it as residential. If the law had forbidden use for this purpose (instead of forbidding any other use) it could not have been more effective than natural economic forces have been. The sole attraction of Maude Avenue back yards as a residence neighborhood has not been sufficient to overcome the residential disadvantages in other directions.

In *Mayor and City Council of Baltimore v. Biermann, supra* [187 Md. 514, 50 A. 2d 808], we held that the property owner has "the heavy burden" of overcoming the presumption of constitutionality of legislative action in denying application for a filling station permit, and that this presumption attached to minority veto as well as

308

to an unconditional legislative prohibition. We need not consider just how "heavy" this burden is in other cases as compared with filling station cases. In *Benner v. Tribbitt*, 190 Md. 6, 57 A. 2d 346, we set aside a refusal of a filling station permit on the verdict of a jury that the refusal was arbitrary, supported by evidence of acts and statements by the municipal authorities which showed that they had acted not in the public interest, but to please neighbors and without any regard for the rights of the property owner. In *Mayor and City Council of Baltimore v. Byrd*, 191 Md. 632, 62 A. 2d 588, and in *Cassel v. Mayor and City Council of Baltimore*, 195 Md. 348, 73 A. 2d 486, as in *Northwest Merchants' Terminal v. O'Rourke, supra*, we held arbitrary and invalid ordinances amending the Zoning Ordinance. The instant case is different in its facts, but the question is not fairly debatable whether continued zoning of the *locus* as residential is arbitrary and invalid.

On the facts the instant case is the converse of *Gleason v. Keswick Imp. Ass'n*, 197 Md. 46, 78 A. 2d 164. In that case the property in question had originally been zoned, reasonably we held, as residential, in accordance with actual use. It is still so used, and we set aside an order of the Board in effect re-zoning it as commercial. In that case time had confirmed the reasonableness of the original zoning, instead of demonstrating the contrary or a contrary change.

It has been asked what will be said with respect to other properties in the neighborhood and "where we are going to draw the line". As Mr. Justice Holmes said, "the last is a futile question, and we will answer the others when they arise". *Noble State Bank v. Haskell*, 219 U. S. 104, 112, 31 S. Ct. 186, 188, 55 L. Ed. 112. As was said in *Ellicott v. Mayor and City Council of City of Baltimore, supra* [180 Md. 176, 23 A. 2d 653], the granting of this permit does not mean "that others would be justified". The order must be reversed.

*Order reversed, with costs.*

HENDERSON, J., delivered the following dissenting opinion, in which MARBURY, C. J., concurs.

There is virtually no dispute as to the facts in this case, but to understand the contentions made it is necessary to state them in some detail. The irregular lot in question is located between Third and Fourth streets immediately adjacent to and south of the right of way of the Baltimore and Ohio Railroad running east and west, on which are three main tracks leading to the Fairfield Shipyard. There is no siding into the lot. On the north side of the railroad tracks the area is almost exclusively industrial, to the south, residential but largely undeveloped. The line of demarcation between the zones runs generally parallel to and about 50 feet south of the railroad right of way. There is a main street 100 feet wide, known as Maude Avenue, running northeast and southwest intersecting the railroad some distance to the west. Third Street and Fourth Street run at right angles to Maude Avenue. The lot in question contains one portion 180 feet deep, fronting 63 feet on Maude Avenue, with which we are not concerned since there is no request to change its residential classification. In the original zoning plan the line of demarcation mentioned above cuts through the remainder of the lot in question, but, about midway of the lot, is extended to meet Fourth Avenue at right angles. Thus the northerly portion of the lot containing about 32,000 square feet is zoned industrial; the southerly portion containing about 43,000 square feet is zoned residential. The present proceedings seek to have the latter portion re-zoned from residential to industrial or commercial, so as to permit its use for the storage of building materials. The appellant is engaged in the business of wrecking and demolishing buildings, salvaging and reselling the bricks, plumbing, lumber and steel. He has erected a one-story building, 60 feet by 40 feet, on the northerly portion of the lot fronting on Fourth Street, which he uses as an office. He stores materials on the industrial portion of the lot. This use he now desires to extend.

There are seven semi-detached dwellings fronting on Maude Avenue between Third and Fourth Streets and several vacant lots, shown by the photographs to be badly overgrown with weeds and brush. The rear of these lots abut on the property in question, separated by an alley. There are vacant lots, laid out for residences, on the southeast side of Fourth Street opposite the lot in question. The plat shows a machine shop, admittedly a non-conforming use, on the southeast side of Fourth Street adjoining the railroad right of way, and a "fertilizer store", adjoining the railroad right of way on the northwest side of Third Street, which also appears to be a non-conforming use. The plat does not show any other industrial or commercial enterprise south of the tracks, but there is some reference in the record to storage yards beside the tracks between Fifth and Seventh Streets to the southeast.

It is not disputed that the portion of the lot now sought to be re-zoned has been zoned residential since the first comprehensive plan was adopted in 1931. The witness Cox, a real estate expert called by the appellant, testified: "The whole neighborhood, of which this is a part, tends generally in this immediate area to industrial uses in spite of the fact there are residential properties on Maude Avenue to the south and between Fourth and Fifth Streets, some of these properties are more or less in my judgment actually mis-located, so that already at present the industrial activities depreciate the residential desirability of those houses on Maude Avenue in the 300 block. That has happened already. It is because really of the railroad there. * * * of course, houses physically could be built, but I think no right minded speculative builder would dare build a house there because his market price would be less actually than his cost. He would immediately suffer what we call an economic depreciation right off on account of the location. No one would reasonably build a house on these 120 feet and I think the same thing applies on the vacant land to the east." According to this witness, it would appear

that the whole area south of the tracks, for an indeterminate distance, should not have been zoned residential in the first place. The witness Magee testified: "I wouldn't say if there were no lumber yard at all, if there were no railroad there, these houses on Maude Avenue would not be worth more money. That is perfectly obvious. They are in a bad location to begin with". There was testimony that rezoning would increase the value of the lot about $3,500, but in arriving at present value, the witnesses valued the lot at about $2,000 less than the price paid for it, $8,500. The office building was valued at $4,000.

There was testimony that when the appellant purchased the lot in 1948 he signed the contract and made a down payment "without examining the official zone maps which would have shown the exact line", and was under the impression it was zoned industrial. However, it was admitted that "before settlement was consummated he realized part of it was in a residential zone". He "went ahead with the purchase" and thereafter erected the building above mentioned. Subsequently, in 1949, he obtained permission to erect a six-food fence around the whole lot, but the Board disapproved use of the residential portion of the lot for storage of building materials. The present application was disapproved by the Building Engineer, the Board of Zoning Appeals, and the trial court on appeal. Three members of the Board voted to allow the rezoning, but this was less than the four votes required under paragraph 32(i) of the Ordinance to reverse the action of the Zoning Commissioner.

It may be true that the extension of the industrial zone into the residential for a distance of 120 feet on Fourth Street, as sought, would probably not have a marked effect on the value of residential properties, which are already adversely affected by the location of the railroad and the existing permitted use. On the other hand, the extended use, as a storage yard for the salvage of a wrecker, is not a trivial matter and is ex-

pressly forbidden in a residential use district by paragraph 8 (27) of the Ordinance.

The appellant sought a special exception by the Board of Zoning Appeals relying upon paragraph 33(b) of the ordinance which authorizes the Board to "grant a permit where the use or change of use of land, buildings or structures proposed to be used is limited as to its location because of the size of buildings, size of yards, irregularity of shape of land or buildings, topography, grade or accessibility". He also relied upon paragraph 12, but this contention seems to have been abandoned, as it is not mentioned in his brief. He now makes the broad contention that the continuance of the zoning restriction against the southern portion of the lot is arbitrary, unreasonable and beyond the police power, and that it deprives the appellant of a reasonable use of his property without due process of law.

In *Mayor and City Council of Baltimore v. Biermann,* 187 Md. 514, 50 A. 2d 804, we indicated that there was a heavy burden upon the property owner to overcome the presumption of constitutionality and to set aside negative action of the Board, exercising a *quasi*-legislative veto power in disallowing a filling station permit. In the instant case the Board had no discretion to disregard the established zone lines. It could only grant a special exception under 33(b) predicated upon some peculiarity in the size, irregularity or topography of the particular lot, not common to the neighborhood. Cf. *Easter v. Mayor and City Council of Baltimore,* 195 Md. 395, 73 A. 2d 491 and *Heath v. Mayor and City Council of Baltimore,* 187 Md. 296, 49 A. 2d 799. The testimony shows no such peculiarities. What the appellant is really contending is that the existence of the railroad tracks, the permitted use on part of the lot and the general character of the neighborhood, demonstrate the unreasonableness of the restriction. In short, the contention is that the line of demarcation was erroneously drawn in the first place and time has confirmed the error.

I think the argument is untenable. Lines must be drawn somewhere. Wherever drawn, residence property on the border will be affected to some extent, and industrial users will be tempted to extend the zone as their business grows. But it is clear that nothing short of confiscation will justify judicial interference. If the question is "fairly debatable", the courts will not hold the zoning to be unreasonable. *Board of County Com'rs of Anne Arundel County v. Snyder,* 186 Md. 342, 46 A. 2d 689; *Francis v. MacGill,* 196 Md. 77, 75 A. 2d 91. Since zoning looks to the future, it is immaterial that land is undeveloped when zoned or remains so thereafter. Nor is it material that the land zoned residential would be more valuable in another classification. *Easter v. Mayor and City Council of Baltimore, supra.* Where zoning is accomplished as a part of a comprehensive plan there is a strong presumption in its favor, not to be overthrown through piece-meal exceptions by administrative agencies or by the courts. If time brings changes in the character of an area, rezoning can best be accomplished by comprehensive study and reconsideration of the original plan. There is no evidence of a marked change in the instant case. The tracks were there in 1931. The testimony seems to be that it should never have been zoned residential. If a special exception is now granted, all of the arguments now advanced would support a further extension at other points.

I think the testimony does not show that the portion of the lot in question is wholly unsuitable for residential use. There are dwellings and residential lots on Maude Avenue adjoining one side of the lot in question. There are residential lots across Fourth Street. The third side of the lot, which is roughly triangular, abuts on the line of demarcation about 50 feet from the railroad right of way. The real estate experts admit that the residential portion of the lot in question is worth $1,200 in its present classification, although they say it would be worth $4,700 if reclassified. Their argument of unsuitability is based entirely on the existence of the

railroad tracks and the existing permitted use. Such considerations were held not to be controlling in the recent case of *Gleason v. Keswick Improv. Ass'n,* 197 Md. 46, 78 A. 2d 164. In that case the effort was to extend the commercial zone along a railroad right of way, and it was shown that the property would have greater value and utility if the change were made. We reversed the Board's action in granting an exception.

The appellant relies strongly upon *Northwest Merchants Terminal v. O'Rourke,* 191 Md. 171, 191, 60 A. 2d 743, 752. In that case land which had been in a second commercial district for fifteen years, and had been purchased for such use, was changed to a residential use district by ordinance. We found no basis for the change, except the desire of the neighbors to have the property remain vacant, and that the land was wholly unsuitable for residential use. We said that the presumption of reasonableness "applies to re-zoning, as well as to original zoning * * * but not with the same weight. Indeed it creates a counter-presumption that zones are 'well planned and arranged' and are to be 'more or less permanent' subject to change only to meet genuine change in conditions." In the instant case, the effort is to change the zoning lines that were established as a result of a comprehensive study, have remained unchallenged for twenty years, and upon the faith of which a number of residences have been erected. The case is clearly distinguishable. I think the trial court was correct in holding that the appellant did not meet the burden of establishing that the original zoning was so unreasonable as to amount to confiscation.

Marbury, C. J., authorizes me to say that he concurs in this dissent.